## BUSINESS ELECTRONICS CORP. *v.* SHARP ELECTRONICS CORP.

No. 85–1910.  Argued January 19, 1988—Decided May 2, 1988

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, MARSHALL, BLACKMUN, and O'CONNOR, JJ., joined. STEVENS, J., filed a dissenting opinion, in which WHITE, J., joined, *post*, p. 736.  KENNEDY, J., took no part in the consideration or decision of the case.

*Gary V. McGowan* argued the cause and filed briefs for petitioner.

*Harold R. Tyler, Jr.* argued the cause for respondent. With him on the brief was *Lance Gotthoffer.**

---

*Briefs of *amici curiae* urging reversal were filed for Forty-two States by *J. Joseph Curran, Jr.*, Attorney General of Maryland, and *Michael F. Brockmeyer* and *Craig J. Hornig*, Assistant Attorneys General, by *Anthony J. Celebrezze, Jr.*, Attorney General of Ohio, and *Gregory E. Young* and *Matthew C. Lawry*, Assistant Attorneys General, by *Don Siegelman*, Attorney General of Alabama, and *James Prude*, Assistant Attorney General, by *Grace Berg Schaible*, Attorney General of Alaska, and *Richard D.*

JUSTICE SCALIA delivered the opinion of the Court.

Petitioner Business Electronics Corporation seeks review of a decision of the United States Court of Appeals for the

*Monkman,* Assistant Attorney General, by *Robert K. Corbin,* Attorney General of Arizona, and *Alison B. Swan,* Assistant Attorney General, by *John Steven Clark,* Attorney General of Arkansas, and *Jeffrey A. Bell,* Deputy Attorney General, by *Duane Woodard,* Attorney General of Colorado, *Thomas P. McMahon,* First Assistant Attorney General, and *David S. Harmon* and *James R. Lewis,* Assistant Attorneys General, by *Joseph Lieberman,* Attorney General of Connecticut, and *Robert M. Langer,* Assistant Attorney General, by *Robert A. Butterworth,* Attorney General of Florida, by *James T. Jones,* Attorney General of Idaho, by *Neil F. Hartigan,* Attorney General of Illinois, and *Robert E. Davy, Jr.,* Assistant Attorney General, by *Linley E. Pearson,* Attorney General of Indiana, and *Frank A. Baldwin,* Deputy Attorney General, by *Thomas J. Miller,* Attorney General of Iowa, and *John R. Perkins,* Deputy Attorney General, by *Robert T. Stephan,* Attorney General of Kansas, and *Carl M. Anderson,* Assistant Attorney General, by *David L. Armstrong,* Attorney General of Kentucky, by *William J. Guste, Jr.,* Attorney General of Louisiana, by *James M. Shannon,* Attorney General of Massachusetts, and *Barbara Anthony,* Assistant Attorney General, by *Frank J. Kelley,* Attorney General of Michigan, *Louis J. Caruso,* Solicitor General, and *Frederick H. Hoffecker* and *Robert C. Ward,* Assistant Attorneys General, by *Hubert H. Humphrey III,* Attorney General of Minnesota, by *Edwin L. Pittman,* Attorney General of Mississippi, and *Robert E. Sanders,* Special Assistant Attorney General, by *William L. Webster,* Attorney General of Missouri, by *Mike Greely,* Attorney General of Montana, and *Joe Roberts,* Assistant Attorney General, by *Robert M. Spire,* Attorney General of Nebraska, and *Dale A. Comer,* Assistant Attorney General, by *Brian McKay,* Attorney General of Nevada, and *P. Gregory Giordano,* Deputy Attorney General, by *Stephen E. Merrill,* Attorney General of New Hampshire, and *Amy L. Ignatius,* Senior Assistant Attorney General, by *W. Cary Edwards,* Attorney General of New Jersey, and *Laurel A. Price,* Deputy Attorney General, by *Robert Abrams,* Attorney General of New York, *O. Peter Sherwood,* Solicitor General, and *Lloyd E. Constantine,* Assistant Attorney General, by *Lacy H. Thornburg,* Attorney General of North Carolina, and *Richard Carlton,* Assistant Attorney General, by *Dave Frohnmayer,* Attorney General of Oregon, by *Leroy S. Zimmerman,* Attorney General of Pennsylvania, and *Eugene F. Waye,* Deputy Attorney General, by *James E. O'Neil,* Attorney General of Rhode Island, by *Roger A. Tellinghuisen,* Attorney General of South Dakota, and *Jeffrey P.*

Fifth Circuit holding that a vertical restraint is *per se* illegal under § 1 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1, only if there is an express or implied agreement to set resale prices at some level. 780 F. 2d 1212, 1215–1218 (1986). We granted certiorari, 482 U. S. 912 (1987), to resolve a conflict in the Courts of Appeals regarding the proper dividing line between the rule that vertical price restraints are illegal *per se* and the rule that vertical nonprice restraints are to be judged under the rule of reason.[1]

---

*Hallem*, Assistant Attorney General, by *W. J. Michael Cody*, Attorney General of Tennessee, and *Perry A. Craft*, Deputy Attorney General, by *Jim Mattox*, Attorney General of Texas, *Mary F. Keller*, Executive Assistant Attorney General, and *J. L. Covington* and *Allene D. Evans*, Assistant Attorneys General, by *David L. Wilkinson*, Attorney General of Utah, and *Richard M. Hagstrom*, Assistant Attorney General, by *Jeffrey L. Amestoy*, Attorney General of Vermont, and *Glenn A. Jarrett*, Assistant Attorney General, by *Mary Sue Terry*, Attorney General of Virginia, and *Allen L. Jackson*, Assistant Attorney General, by *Kenneth O. Eikenberry*, Attorney General of Washington, and *John R. Ellis*, Deputy Attorney General, by *Charles G. Brown*, Attorney General of West Virginia, *C. William Ullrich*, First Deputy Attorney General, and *Mark D. Kindt*, Deputy Attorney General, by *Donald J. Hanaway*, Attorney General of Wisconsin, and *Kevin J. O'Connor*, Assistant Attorney General, and by *Joseph B. Meyer*, Attorney General of Wyoming; for K mart Corporation by *Robert W. Steele*, *Robert E. Hebda*, and *James C. Tuttle;* and for the National Mass Retailing Institute by *William D. Coston* and *Robert J. Verdisco*.

Briefs of *amici curiae* urging affirmance were filed for the Consumer Electronics Group of the Electronic Industries Association by *Gary J. Shapiro;* for the National Association of Manufacturers by *Jan S. Amundson*, *Quentin Riegel*, and *Donald I. Baker;* and for the National Office Machine Dealers Association by *Samuel Schoenberg*.

[1] The Seventh, Eighth, and Tenth Circuits have agreed with the analysis of the Fifth. See *Morrison* v. *Murray Biscuit Co.*, 797 F. 2d 1430, 1440 (CA7 1986); *McCabe's Furniture, Inc.* v. *La-Z-Boy Chair Co.*, 798 F. 2d 323, 329 (CA8 1986), cert. pending, No. 86–1101; *Westman Commission Co.* v. *Hobart Int'l, Inc.*, 796 F. 2d 1216, 1223–1224 (CA10 1986), cert. pending, No. 86–484. Decisions of the Third and Ninth Circuits have disagreed. See *Cernuto, Inc.* v. *United Cabinet Corp.*, 595 F. 2d 164, 168–170 (CA3 1979); *Zidell Explorations, Inc.* v. *Conval Int'l, Ltd.*, 719 F. 2d 1465, 1469–1470 (CA9 1983).

I

In 1968, petitioner became the exclusive retailer in the Houston, Texas, area of electronic calculators manufactured by respondent Sharp Electronics Corporation. In 1972, respondent appointed Gilbert Hartwell as a second retailer in the Houston area. During the relevant period, electronic calculators were primarily sold to business customers for prices up to $1,000. While much of the evidence in this case was conflicting—in particular, concerning whether petitioner was "free riding" on Hartwell's provision of presale educational and promotional services by providing inadequate services itself—a few facts are undisputed. Respondent published a list of suggested minimum retail prices, but its written dealership agreements with petitioner and Hartwell did not obligate either to observe them, or to charge any other specific price. Petitioner's retail prices were often below respondent's suggested retail prices and generally below Hartwell's retail prices, even though Hartwell too sometimes priced below respondent's suggested retail prices. Hartwell complained to respondent on a number of occasions about petitioner's prices. In June 1973, Hartwell gave respondent the ultimatum that Hartwell would terminate his dealership unless respondent ended its relationship with petitioner within 30 days. Respondent terminated petitioner's dealership in July 1973.

Petitioner brought suit in the United States District Court for the Southern District of Texas, alleging that respondent and Hartwell had conspired to terminate petitioner and that such conspiracy was illegal *per se* under § 1 of the Sherman Act. The case was tried to a jury. The District Court submitted a liability interrogatory to the jury that asked whether "there was an agreement or understanding between Sharp Electronics Corporation and Hartwell to terminate Business Electronics as a Sharp dealer because of Business Electronics' price cutting." Record, Doc. No. 241. The District Court instructed the jury at length about this question:

"The Sherman Act is violated when a seller enters into an agreement or understanding with one of its dealers to terminate another dealer because of the other dealer's price cutting. Plaintiff contends that Sharp terminated Business Electronics in furtherance of Hartwell's desire to eliminate Business Electronics as a price-cutting rival.

"If you find that there was an agreement between Sharp and Hartwell to terminate Business Electronics because of Business Electronics' price cutting, you should answer yes to Question Number 1.

.        .        .        .        .

"A combination, agreement or understanding to terminate a dealer because of his price cutting unreasonably restrains trade and cannot be justified for any reason. Therefore, even though the combination, agreement or understanding may have been formed or engaged in . . . to eliminate any alleged evils of price cutting, it is still unlawful. . . .

"If a dealer demands that a manufacturer terminate a price cutting dealer, and the manufacturer agrees to do so, the agreement is illegal if the manufacturer's purpose is to eliminate the price cutting." App. 18–19.

The jury answered Question 1 affirmatively and awarded $600,000 in damages. The District Court rejected respondent's motion for judgment notwithstanding the verdict or a new trial, holding that the jury interrogatory and instructions had properly stated the law. It entered judgment for petitioner for treble damages plus attorney's fees.

The Fifth Circuit reversed, holding that the jury interrogatory and instructions were erroneous, and remanded for a new trial. It held that, to render illegal *per se* a vertical agreement between a manufacturer and a dealer to terminate a second dealer, the first dealer "must expressly or impliedly agree to set its prices at some level, though not a specific one.

The distributor cannot retain complete freedom to set whatever price it chooses." 780 F. 2d, at 1218.

## II

## A

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U. S. C. § 1. Since the earliest decisions of this Court interpreting this provision, we have recognized that it was intended to prohibit only unreasonable restraints of trade. *National Collegiate Athletic Assn.* v. *Board of Regents of University of Oklahoma*, 468 U. S. 85, 98 (1984); see, *e. g.*, *Standard Oil Co.* v. *United States*, 221 U. S. 1, 60 (1911). Ordinarily, whether particular concerted action violates § 1 of the Sherman Act is determined through case-by-case application of the so-called rule of reason—that is, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S. 36, 49 (1977). Certain categories of agreements, however, have been held to be *per se* illegal, dispensing with the need for case-by-case evaluation. We have said that *per se* rules are appropriate only for "conduct that is manifestly anticompetitive," *id.*, at 50, that is, conduct " 'that would always or almost always tend to restrict competition and decrease output,' " *Northwest Wholesale Stationers, Inc.* v. *Pacific Stationery & Printing Co.*, 472 U. S. 284, 289–290 (1985), quoting *Broadcast Music, Inc.* v. *Columbia Broadcasting System, Inc.*, 441 U. S. 1, 19–20 (1979). See also *FTC* v. *Indiana Federation of Dentists*, 476 U. S. 447, 458–459 (1986) ("[W]e have been slow . . . to extend *per se* analysis to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious"); *National Collegiate*

*Athletic Assn.* v. *Board of Regents of University of Oklahoma, supra,* at 103–104 (*"Per se* rules are invoked when surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct"); *National Society of Professional Engineers* v. *United States,* 435 U. S. 679, 692 (1978) (agreements are *per se* illegal only if their "nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality").

Although vertical agreements on resale prices have been illegal *per se* since *Dr. Miles Medical Co.* v. *John D. Park & Sons Co.,* 220 U. S. 373 (1911), we have recognized that the scope of *per se* illegality should be narrow in the context of vertical restraints.  In *Continental T. V., Inc.* v. *GTE Sylvania Inc., supra,* we refused to extend *per se* illegality to vertical nonprice restraints, specifically to a manufacturer's termination of one dealer pursuant to an exclusive territory agreement with another.  We noted that especially in the vertical restraint context "departure from the rule-of-reason standard must be based on demonstrable economic effect rather than . . . upon formalistic line drawing."  *Id.,* at 58–59.  We concluded that vertical nonprice restraints had not been shown to have such a "'pernicious effect on competition'" and to be so "'lack[ing] [in] . . . redeeming value'" as to justify *per se* illegality.  *Id.,* at 58, quoting *Northern Pacific R. Co.* v. *United States,* 356 U. S. 1, 5 (1958).  Rather, we found, they had real potential to stimulate interbrand competition, "the primary concern of antitrust law," 433 U. S., at 52, n. 19:

> "[N]ew manufacturers and manufacturers entering new markets can use the restrictions in order to induce competent and aggressive retailers to make the kind of investment of capital and labor that is often required in the distribution of products unknown to the consumer.  Established manufacturers can use them to induce retailers

to engage in promotional activities or to provide service and repair facilities necessary to the efficient marketing of their products. Service and repair are vital for many products. . . . The availability and quality of such services affect a manufacturer's goodwill and the competitiveness of his product. Because of market imperfections such as the so-called 'free-rider' effect, these services might not be provided by retailers in a purely competitive situation, despite the fact that each retailer's benefit would be greater if all provided the services than if none did." *Id.*, at 55.

Moreover, we observed that a rule of *per se* illegality for vertical nonprice restraints was not needed or effective to protect *intra*brand competition. First, so long as interbrand competition existed, that would provide a "significant check" on any attempt to exploit intrabrand market power. *Id.*, at 52, n. 19; see also *id.*, at 54. In fact, in order to meet that interbrand competition, a manufacturer's dominant incentive is to lower resale prices. *Id.*, at 56, and n. 24. Second, the *per se* illegality of vertical restraints would create a perverse incentive for manufacturers to integrate vertically into distribution, an outcome hardly conducive to fostering the creation and maintenance of small businesses. *Id.*, at 57, n. 26.

Finally, our opinion in *GTE Sylvania* noted a significant distinction between vertical nonprice and vertical price restraints. That is, there was support for the proposition that vertical price restraints reduce *inter*brand price competition because they "'facilitate cartelizing.'" *Id.*, at 51, n. 18, quoting Posner, Antitrust Policy and the Supreme Court: An Analysis of the Restricted Distribution, Horizontal Merger and Potential Competition Decisions, 75 Colum. L. Rev. 282, 294 (1975). The authorities cited by the Court suggested how vertical price agreements might assist horizontal price fixing at the manufacturer level (by reducing the manufacturer's incentive to cheat on a cartel, since its retailers could not pass on lower prices to consumers) or might be used to

organize cartels at the retailer level. See R. Posner, Antitrust: Cases, Economic Notes and Other Materials 134 (1974); E. Gellhorn, Antitrust Law and Economics 252, 256 (1976); Note, Vertical Territorial and Customer Restrictions in the Franchising Industry, 10 Colum. J. L. & Soc. Prob. 497, 498, n. 12 (1974). Similar support for the cartel-facilitating effect of vertical nonprice restraints was and remains lacking.

We have been solicitous to assure that the market-freeing effect of our decision in *GTE Sylvania* is not frustrated by related legal rules. In *Monsanto Co.* v. *Spray-Rite Service Corp.*, 465 U. S. 752, 763 (1984), which addressed the evidentiary showing necessary to establish vertical concerted action, we expressed concern that "[i]f an inference of such an agreement may be drawn from highly ambiguous evidence, there is considerable danger that the doctrin[e] enunciated in *Sylvania* . . . will be seriously eroded." See also *id.*, at 761, n. 6. We eschewed adoption of an evidentiary standard that "could deter or penalize perfectly legitimate conduct" or "would create an irrational dislocation in the market" by preventing legitimate communication between a manufacturer and its distributors. *Id.*, at 763, 764.

Our approach to the question presented in the present case is guided by the premises of *GTE Sylvania* and *Monsanto:* that there is a presumption in favor of a rule-of-reason standard; that departure from that standard must be justified by demonstrable economic effect, such as the facilitation of cartelizing, rather than formalistic distinctions; that interbrand competition is the primary concern of the antitrust laws; and that rules in this area should be formulated with a view towards protecting the doctrine of *GTE Sylvania.* These premises lead us to conclude that the line drawn by the Fifth Circuit is the most appropriate one.

There has been no showing here that an agreement between a manufacturer and a dealer to terminate a "price cutter," without a further agreement on the price or price levels to be charged by the remaining dealer, almost always tends

to restrict competition and reduce output. Any assistance to cartelizing that such an agreement might provide cannot be distinguished from the sort of minimal assistance that might be provided by vertical nonprice agreements like the exclusive territory agreement in *GTE Sylvania,* and is insufficient to justify a *per se* rule. Cartels are neither easy to form nor easy to maintain. Uncertainty over the terms of the cartel, particularly the prices to be charged in the future, obstructs both formation and adherence by making cheating easier. Cf. *Maple Flooring Mfrs. Assn.* v. *United States,* 268 U. S. 563 (1925); *Cement Mfrs. Protective Assn.* v. *United States,* 268 U. S. 588 (1925); see generally *Matsushita Electric Industrial Co.* v. *Zenith Radio Corp.,* 475 U. S. 574, 590 (1986). Without an agreement with the remaining dealer on price, the manufacturer both retains its incentive to cheat on any manufacturer-level cartel (since lower prices can still be passed on to consumers) and cannot as easily be used to organize and hold together a retailer-level cartel.[2]

The District Court's rule on the scope of *per se* illegality for vertical restraints would threaten to dismantle the doctrine of *GTE Sylvania.* Any agreement between a manufacturer and a dealer to terminate another dealer who happens to have charged lower prices can be alleged to have been directed against the terminated dealer's "price cutting." In the vast majority of cases, it will be extremely difficult for the manufacturer to convince a jury that its motivation was to ensure adequate services, since price cutting and

---

[2] The dissent's principal fear appears to be not cartelization at either level, but Hartwell's assertion of dominant retail power. This fear does not possibly justify adopting a rule of *per se* illegality. Retail market power is rare, because of the usual presence of interbrand competition and other dealers, see *Continental T. V., Inc.* v. *GTE Sylvania Inc.,* 433 U. S. 36, 54 (1977), and it should therefore not be assumed but rather must be proved. Cf. Baxter, The Viability of Vertical Restraints Doctrine, 75 Calif. L. Rev. 933, 948–949 (1987). Of course this case was not prosecuted on the theory, and therefore the jury was not asked to find, that Hartwell possessed such market power.

some measure of service cutting usually go hand in hand. Accordingly, a manufacturer that agrees to give one dealer an exclusive territory and terminates another dealer pursuant to that agreement, or even a manufacturer that agrees with one dealer to terminate another for failure to provide contractually obligated services, exposes itself to the highly plausible claim that its real motivation was to terminate a price cutter. Moreover, even vertical restraints that do not result in dealer termination, such as the initial granting of an exclusive territory or the requirement that certain services be provided, can be attacked as designed to allow existing dealers to charge higher prices. Manufacturers would be likely to forgo legitimate and competitively useful conduct rather than risk treble damages and perhaps even criminal penalties.

We cannot avoid this difficulty by invalidating as illegal *per se* only those agreements imposing vertical restraints that contain the word "price," or that affect the "prices" charged by dealers. Such formalism was explicitly rejected in *GTE Sylvania*. As the above discussion indicates, all vertical restraints, including the exclusive territory agreement held not to be *per se* illegal in *GTE Sylvania*, have the potential to allow dealers to increase "prices" and can be characterized as intended to achieve just that. In fact, vertical nonprice restraints only accomplish the benefits identified in *GTE Sylvania* because they reduce intrabrand price competition to the point where the dealer's profit margin permits provision of the desired services. As we described it in *Monsanto:* "The manufacturer often will want to ensure that its distributors earn sufficient profit to pay for programs such as hiring and training additional salesmen or demonstrating the technical features of the product, and will want to see that 'free-riders' do not interfere." 465 U. S., at 762–763. See also *GTE Sylvania*, 433 U. S., at 55.

The dissent erects a much more complex analytic structure, which ultimately rests, however, upon the same dis-

credited premise that the only function this nonprice vertical restriction can serve is restraint of dealer-level competition.   Specifically, the dissent's reasoning hinges upon its perception that the agreement between Sharp and Hartwell was a "naked" restraint—that is, it was not "ancillary" to any other agreement between Sharp and Hartwell.   *Post,* at 736–742, 744–745.   But that is not true, unless one assumes, contrary to *GTE Sylvania* and *Monsanto,* and contrary to our earlier discussion, that it is not a quite plausible purpose of the restriction to enable Hartwell to provide better services under the sales franchise agreement.[3]   From its

---

[3] The conclusion of "naked" restraint could also be sustained on another assumption, namely, that an agreement is not "ancillary" unless it is designed to enforce a contractual obligation of one of the parties to the contract.   The dissent appears to accept this assumption.   See *post,* at 739–741, and n. 3, 744–746.   It is plainly wrong.   The classic "ancillary" restraint is an agreement by the seller of a business not to compete within the market.   See *Mitchel* v. *Reynolds,* 1 P. Wms. 181, 24 Eng. Rep. 347 (1711); Restatement (Second) of Contracts § 188(2)(a) (1981).   That is not ancillary to any other contractual obligation, but, like the restraint here, merely enhances the value of the contract, or permits the "enjoyment of [its] fruits."   *United States* v. *Addyston Pipe & Steel Co.,* 85 F. 271, 282 (CA6 1898), aff'd, 175 U. S. 211 (1899); cf. Restatement (Second) of Contracts §§ 187, 188 (1981) (restraint may be ancillary to a "transaction *or relationship*") (emphasis added); R. Bork, The Antitrust Paradox 29 (1978) (hereinafter Bork) (vertical arrangements are ancillary to the "transaction of supplying and purchasing").

More important than the erroneousness of the dissent's common-law analysis of "naked" and "ancillary" restraints are the perverse economic consequences of permitting nonprice vertical restraints to avoid *per se* invalidity only through attachment to an express contractual obligation. Such an approach is contrary to the express views of the principal scholar on whom the dissent relies.   See 7 P. Areeda, Antitrust Law § 1457c, p. 170 (1986) (hereinafter Areeda) (legality of terminating price cutter should not depend upon formal adoption of service obligations that termination is assertedly designed to protect).   In the precise case of a vertical agreement to terminate other dealers, for example, there is no conceivable reason why the existence of an exclusivity commitment by the manufacturer to the one remaining dealer would render anticompetitive effects less likely, or the procompetitive effects on services more likely—so that the

faulty conclusion that what we have before us is a "naked" restraint, the dissent proceeds, by reasoning we do not entirely follow, to the further conclusion that it is therefore a horizontal rather than a vertical restraint. We pause over this only to note that in addition to producing what we think the wrong result in the present case, it introduces needless confusion into antitrust terminology. Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints.[4]

dissent's line for *per se* illegality fails to meet the requirement of *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S., at 59, that it be based on "demonstrable economic effect." If anything, the economic effect of the dissent's approach is perverse, encouraging manufacturers to agree to otherwise inefficient contractual provisions for the sole purpose of attaching to them efficient nonprice vertical restraints which, only by reason of such attachment, can avoid *per se* invalidity as "naked" restraints. The dissent's approach would therefore create precisely the kind of "irrational dislocation in the market" that legal rules in this area should be designed to avoid. *Monsanto Co.* v. *Spray-Rite Service Corp.*, 465 U. S. 752, 764 (1984).

[4] The dissent apparently believes that whether a restraint is horizontal depends upon whether its anticompetitive *effects* are horizontal, and not upon whether it is the product of a horizontal agreement. *Post*, at 745–747, and n. 10. That is of course a conceivable way of talking, but if it were the language of antitrust analysis there would be no such thing as an unlawful vertical restraint, since all anticompetitive effects are by definition horizontal effects. The dissent quotes a statement of Professor Areeda as supposed adoption of its definition of horizontal restraint. *Post*, at 745–746, n. 10, quoting Areeda § 1457d, p. 174. That statement seems to us to be, to the contrary, Professor Areeda's attempt to explain a peculiar usage of the term "horizontal" in *Cernuto, Inc.* v. *United Cabinet Corp.*, 595 F. 2d, at 168, noting that (even though *Cernuto* did not involve a horizontal restraint) the use of the term "horizontal" was "appropriate to capture the fact that dealer interests opposed to those of the manufacturer were being served." Areeda § 1457d, p. 174. The dissent also seeks to associate Judge Bork with its terminological confusion. See *post*, at 746, n. 10, quoting Bork 288. What the quoted passage says, how-

Finally, we do not agree with petitioner's contention that an agreement on the remaining dealer's price or price levels will so often follow from terminating another dealer "because of [its] price cutting" that prophylaxis against resale price maintenance warrants the District Court's *per se* rule.   Petitioner has provided no support for the proposition that vertical price agreements generally underlie agreements to terminate a price cutter.   That proposition is simply incompatible with the conclusion of *GTE Sylvania* and *Monsanto* that manufacturers are often motivated by a legitimate desire to have dealers provide services, combined with the reality that price cutting is frequently made possible by "free riding" on the services provided by other dealers.   The District Court's *per se* rule would therefore discourage conduct recognized by *GTE Sylvania* and *Monsanto* as beneficial to consumers.

## B

In resting our decision upon the foregoing economic analysis, we do not ignore common-law precedent concerning what constituted "restraint of trade" at the time the Sherman Act was adopted.   But neither do we give that pre-1890 precedent the dispositive effect some would.   The term "restraint of trade" in the statute, like the term at common law, refers not to a particular list of agreements, but to a particular economic consequence, which may be produced by quite different sorts of agreements in varying times and circumstances. The changing content of the term "restraint of trade" was well recognized at the time the Sherman Act was enacted. See *Gibbs* v. *Consolidated Gas Co.*, 130 U. S. 396, 409 (1889) (noting that English case laying down the common-law rule

---

ever, is that a facially vertical restraint imposed by a manufacturer only because it has been coerced by a "horizontal carte[l]" agreement among his distributors is in reality a horizontal restraint.   That says precisely what we say: that a restraint is horizontal not because it has horizontal effects, but because it is the product of a horizontal agreement.

that contracts in restraint of trade are invalid "was made under a condition of things, and a state of society, different from those which now prevail, [and therefore] the rule laid down is not regarded as inflexible, and has been considerably modified"); see also *Dr. Miles Medical Co.* v. *John D. Park & Sons Co.*, 220 U. S., at 406 ("With respect to contracts in restraint of trade, the earlier doctrine of the common law has been substantially modified in adaptation to modern conditions"); B. Cardozo, The Nature of the Judicial Process 94–96 (1921).

The Sherman Act adopted the term "restraint of trade" along with its dynamic potential. It invokes the common law itself, and not merely the static content that the common law had assigned to the term in 1890. See *GTE Sylvania*, 433 U. S., at 53, n. 21; *Standard Oil Co.* v. *United States*, 221 U. S., at 51–60; see also *McNally* v. *United States*, 483 U. S. 350, 372–373 (1987) (STEVENS, J., joined by O'CONNOR, J., dissenting); *Associated General Contractors of California, Inc.* v. *Carpenters*, 459 U. S. 519, 533, n. 28, 539–540, and n. 43 (1983); Bork 37. If it were otherwise, not only would the line of *per se* illegality have to be drawn today precisely where it was in 1890, but also case-by-case evaluation of legality (conducted where *per se* rules do not apply) would have to be governed by 19th-century notions of reasonableness. It would make no sense to create out of the single term "restraint of trade" a chronologically schizoid statute, in which a "rule of reason" evolves with new circumstances and new wisdom, but a line of *per se* illegality remains forever fixed where it was.

Of course the common law, both in general and as embodied in the Sherman Act, does not lightly assume that the economic realities underlying earlier decisions have changed, or that earlier judicial perceptions of those realities were in error. It is relevant, therefore, whether the common law of

restraint of trade ever prohibited as illegal *per se* an agreement of the sort made here, and whether our decisions under § 1 of the Sherman Act have ever expressed or necessarily implied such a prohibition.

With respect to this Court's understanding of pre-Sherman Act common law, petitioner refers to our decision in *Dr. Miles Medical Co.* v. *John D. Park & Sons Co., supra.* Though that was an early Sherman Act case, its holding that a resale price maintenance agreement was *per se* illegal was based largely on the perception that such an agreement was categorically impermissible at common law. *Id.*, at 404–408. As the opinion made plain, however, the basis for that common-law judgment was that the resale restriction was an unlawful restraint on alienation. See *ibid.* As we explained in *Boston Store of Chicago* v. *American Graphophone Co.*, 246 U. S. 8, 21–22 (1918), "*Dr. Miles* . . . decided that under the general law the owner of movables . . . could not sell the movables and lawfully by contract fix a price at which the product should afterwards be sold, because to do so would be at one and the same time to sell and retain, to part with and yet to hold, to project the will of the seller so as to cause it to control the movable parted with when it was not subject to his will because owned by another." In the present case, of course, no agreement on resale price or price level, and hence no restraint on alienation, was found by the jury, so the common-law rationale of *Dr. Miles* does not apply. Cf. *United States* v. *General Electric Co.*, 272 U. S. 476, 486–488 (1926) (*Dr. Miles* does not apply to restrictions on price to be charged by one who is in reality an agent of, not a buyer from, the manufacturer).

Petitioner's principal contention has been that the District Court's rule on *per se* illegality is compelled not by the old common law, but by our more recent Sherman Act precedents. First, petitioner contends that since certain horizontal agreements have been held to constitute price fixing (and

thus to be *per se* illegal) though they did not set prices or price levels, see, *e. g., Catalano, Inc.* v. *Target Sales, Inc.*, 446 U. S. 643, 647–650 (1980) *(per curiam)*, it is improper to require that a vertical agreement set prices or price levels before it can suffer the same fate. This notion of equivalence between the scope of horizontal *per se* illegality and that of vertical *per se* illegality was explicitly rejected in *GTE Sylvania, supra,* at 57, n. 27—as it had to be, since a horizontal agreement to divide territories is *per se* illegal, see *United States* v. *Topco Associates, Inc.*, 405 U. S. 596, 608 (1972), while *GTE Sylvania* held that a vertical agreement to do so is not. See also *United States* v. *Arnold, Schwinn & Co.*, 388 U. S. 365, 390–391 (1967) (Stewart, J., joined by Harlan, J., concurring in part and dissenting in part); *White Motor Co.* v. *United States*, 372 U. S. 253, 263 (1963).

Second, petitioner contends that *per se* illegality here follows from our two cases holding *per se* illegal a group boycott of a dealer because of its price cutting. See *United States* v. *General Motors Corp.*, 384 U. S. 127 (1966); *Klor's, Inc.* v. *Broadway-Hale Stores, Inc.*, 359 U. S. 207 (1959). This second contention is merely a restatement of the first, since both cases involved horizontal combinations—*General Motors, supra,* at 140, 143–145, at the dealer level,[5] and *Klor's, supra,* at 213, at the manufacturer and wholesaler levels. Accord, *GTE Sylvania, supra,* at 58, n. 28, *United States* v. *Arnold, Schwinn & Co.*, 388 U. S., at 373, 378; *id.,* at 390 (Stewart, J., joined by Harlan, J., concurring in part and dissenting in part); *White Motor Co.* v. *United States, supra,* at 263.

---

[5] Contrary to the dissent, *post,* at 742–743, 747, *General Motors* does not differ from the present case merely in that it involved a three-party rather than a two-party agreement. The agreement was among competitors in *General Motors;* it was between noncompetitors here. Cf. Bork 330 (defining "boycotts" as "agreements among competitors to refuse to deal").

Third, petitioner contends, relying on *Albrecht* v. *Herald Co.*, 390 U. S. 145 (1968), and *United States* v. *Parke, Davis & Co.*, 362 U. S. 29 (1960), that our vertical price-fixing cases have already rejected the proposition that *per se* illegality requires setting a price or a price level. We disagree. In *Albrecht*, the maker of the product formed a combination to force a retailer to charge the maker's advertised retail price. See 390 U. S., at 149. This combination had two aspects. Initially, the maker hired a third party to solicit customers away from the noncomplying retailer. This solicitor "was aware that the aim of the solicitation campaign was to force [the noncomplying retailer] to lower his price" to the suggested retail price. *Id.*, at 150. Next, the maker engaged another retailer who "undertook to deliver [products] at the suggested price" to the noncomplying retailer's customers obtained by the solicitor. *Ibid.* This combination of maker, solicitor, and new retailer was held to be *per se* illegal. *Id.*, at 150, 153. It is plain that the combination involved both an explicit agreement on resale price and an agreement to force another to adhere to the specified price.

In *Parke, Davis*, a manufacturer combined first with wholesalers and then with retailers in order to gain the "retailers' adherence to its suggested minimum retail prices." 362 U. S., at 45–46, and n. 6. The manufacturer also brokered an agreement among its retailers not to advertise prices below its suggested retail prices, which agreement was held to be part of the *per se* illegal combination. This holding also does not support a rule that an agreement on price or price level is not required for a vertical restraint to be *per se* illegal—first, because the agreement not to advertise prices was part and parcel of the combination that contained the price agreement, *id.*, at 35–36, and second because the agreement among retailers that the manufacturer organized was a *horizontal* conspiracy among competitors. *Id.*, at 46–47.

In sum, economic analysis supports the view, and no precedent opposes it, that a vertical restraint is not illegal *per se*

unless it includes some agreement on price or price levels. Accordingly, the judgment of the Fifth Circuit is

*Affirmed.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.

JUSTICE STEVENS, with whom JUSTICE WHITE joins, dissenting.

In its opinion the majority assumes, without analysis, that the question presented by this case concerns the legality of a "vertical nonprice restraint." As I shall demonstrate, the restraint that results when one or more dealers threaten to boycott a manufacturer unless it terminates its relationship with a price-cutting retailer is more properly viewed as a "horizontal restraint." Moreover, an agreement to terminate a dealer because of its price cutting is most certainly not a "nonprice restraint." The distinction between "vertical nonprice restraints" and "vertical price restraints," on which the majority focuses its attention, is therefore quite irrelevant to the outcome of this case. Of much greater importance is the distinction between "naked restraints" and "ancillary restraints" that has been a part of our law since the landmark opinion written by Judge (later Chief Justice) Taft in *United States* v. *Addyston Pipe & Steel Co.*, 85 F. 271 (CA6 1898), aff'd, 175 U. S. 211 (1899).

I

The plain language of § 1 of the Sherman Act prohibits "every" contract that restrains trade.[1] Because such a literal reading of the statute would outlaw the entire body of private contract law, and because Congress plainly intended

---

[1] Section 1 of the Sherman Act, as set forth in 15 U. S. C. § 1, provides:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

the Act to be interpreted in the light of its common-law background, the Court has long held that certain "ancillary" restraints of trade may be defended as reasonable. As we recently explained without dissent:

> "The Rule of Reason suggested by *Mitchel* v. *Reynolds* [1 P. Wms. 181, 24 Eng. Rep. 347 (1711)] has been regarded as a standard for testing the enforceability of covenants in restraint of trade which are ancillary to a legitimate transaction, such as an employment contract or the sale of a going business. Judge (later Mr. Chief Justice) Taft so interpreted the Rule in his classic rejection of the argument that competitors may lawfully agree to sell their goods at the same price as long as the agreed-upon price is reasonable. *United States* v. *Addyston Pipe & Steel Co. . . . ." National Society of Professional Engineers* v. *United States*, 435 U. S. 679, 689 (1978).

Judge Taft's rejection of an argument that a price-fixing agreement could be defended as reasonable was based on a detailed examination of common-law precedents. He explained that in England there had been two types of objection to voluntary restraints on one's ability to transact business. "One was that by such contracts a man disabled himself from earning a livelihood with the risk of becoming a public charge, and deprived the community of the benefit of his labor. The other was that such restraints tended to give to the covenantee, the beneficiary of such restraints, a monopoly of the trade, from which he had thus excluded one competitor, and by the same means might exclude others." 85 F., at 279. Certain contracts, however, such as covenants not to compete in a particular business, for a certain period of time, within a defined geographical area, had always been considered reasonable when necessary to carry out otherwise procompetitive contracts, such as the sale of a business. *Id.*, at 280–282. The difference between ancillary covenants that

may be justified as reasonable and those that are "void" because there is "nothing to justify or excuse the restraint," *id.*, at 282–283, was described in the opinion's seminal discussion:

> "[T]he contract must be one in which there is a main purpose, to which the covenant in restraint of trade is merely ancillary. The covenant is inserted only to protect one of the parties from the injury which, in the execution of the contract or enjoyment of its fruits, he may suffer from the unrestrained competition of the other. The main purpose of the contract suggests the measure of protection needed, and furnishes a sufficiently uniform standard by which the validity of such restraints may be judicially determined. In such a case, if the restraint exceeds the necessity presented by the main purpose of the contract, it is void for two reasons: First, because it oppresses the covenantor, without any corresponding benefit to the covenantee; and, second, because it tends to a monopoly. But where the sole object of both parties in making the contract as expressed therein is merely to restrain competition, and enhance or maintain prices, it would seem that there was nothing to justify or excuse the restraint, that it would necessarily have a tendency to monopoly, and therefore would be void. In such a case there is no measure of what is necessary to the protection of either party, except the vague and varying opinion of judges as to how much, on principles of political economy, men ought to be allowed to restrain competition. There is in such contracts no main lawful purpose, to subserve which partial restraint is permitted, and by which its reasonableness is measured, but the sole object is to restrain trade in order to avoid the competition which it has always been the policy of the common law to foster." *Ibid.*

Although Judge Taft was writing as a Circuit Judge, his opinion is universally accepted as authoritative. We af-

firmed his decision without dissent, we have repeatedly cited it with approval,[2] and it is praised by a respected scholar as "one of the greatest, if not the greatest, antitrust opinions in the history of the law." R. Bork, The Antitrust Paradox 26 (1978). In accordance with the teaching in that opinion, it is therefore appropriate to look more closely at the character of the restraint of trade found by the jury in this case.

## II

It may be helpful to begin by explaining why the agreement in this case does not fit into certain categories of agreement that are frequently found in antitrust litigation. First, despite the contrary implications in the majority opinion, this is not a case in which the manufacturer is alleged to have imposed any vertical nonprice restraints on any of its dealers. The term "vertical nonprice restraint," as used in *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S. 36 (1977), and similar cases, refers to a contractual term that a dealer must accept in order to qualify for a franchise. Typically, the dealer must agree to meet certain standards in its advertising, promotion, product display, and provision of repair and maintenance services in order to protect the goodwill of the manufacturer's product. Sometimes a dealer must agree to sell only to certain classes of customers — for example, wholesalers generally may only sell to retailers and may be required not to sell directly to consumers. In *Sylvania*, to take another example, we examined agreements between a manufacturer and its dealers that included "provisions barring the retailers from selling franchised products from locations other than those specified in agreements." *Id.*, at 37. Restrictions of that kind, which are a part of, or ancillary to,

---

[2] See, *e. g.*, *Arizona* v. *Maricopa County Medical Society*, 457 U. S. 332, 350, n. 22 (1982); *United States* v. *Topco Associates, Inc.*, 405 U. S. 596, 608 (1972); *Northern Pacific R. Co.* v. *United States*, 356 U. S. 1, 5 (1958).

the basic franchise agreement, are perfectly lawful unless the "rule of reason" is violated. Although vertical nonprice restraints may have some adverse effect on competition, as long as they serve the main purpose of a procompetitive distribution agreement, the ancillary restraints may be defended under the rule of reason. And, of course, a dealer who violates such a restraint may properly be terminated by the manufacturer.[3]

In this case, it does not appear that respondent imposed any vertical nonprice restraints upon either petitioner or Hartwell. Specifically, respondent did not enter into any "exclusive" agreement, as did the defendant in *Sylvania*. It is true that before Hartwell was appointed and after petitioner was terminated, the manufacturer was represented by only one retailer in the Houston market, but there is no evidence that respondent ever made any contractual commitment to give either of them any exclusive rights. This therefore is not a case in which a manufacturer's right to grant exclusive territories, or to change the identity of the dealer in an established exclusive territory, is implicated. The case is one in which one of two competing dealers entered into an agreement with the manufacturer to terminate a particular competitor without making any promise to provide better or more efficient services and without receiving any guarantee of exclusivity in the future. The contractual relationship between respondent and Hartwell was exactly

---

[3] Thus, in *Morrison* v. *Murray Biscuit Co.*, 797 F. 2d 1430 (CA7 1986), cited *ante*, at 720, n. 1, the plaintiff had been terminated because he violated a lawful restriction on the customers to whom he could sell. As the court correctly explained:

"As long as the supplier's motive is not to keep his established dealers' prices up but only to maintain his system of lawful nonprice restrictions, he can terminate noncomplying dealers without fear of antitrust liability. even if he learns about the violation from dealers whose principal or perhaps only concern is with protecting their prices." 797 F. 2d, at 1440.

There was no such justification for the termination in this case.

the same after petitioner's termination as it had been before that termination.

Second, this case does not involve a typical vertical price restraint. As the Court of Appeals noted, there is some evidence in the record that may support the conclusion that respondent and Hartwell implicitly agreed that Hartwell's prices would be maintained at a level somewhat higher than petitioner had been charging before petitioner was terminated. 780 F. 2d 1212, 1219 (CA5 1986). The illegality of the agreement found by the jury does not, however, depend on such evidence. For purposes of analysis, we should assume that no such agreement existed and that respondent was perfectly willing to allow its dealers to set prices at levels that would maximize their profits. That seems to have been the situation during the period when petitioner was the only dealer in Houston. Moreover, after respondent appointed Hartwell as its second dealer, it was Hartwell, rather than respondent, who objected to petitioner's pricing policies.

Third, this is not a case in which the manufacturer acted independently. Indeed, given the jury's verdict, it is not even a case in which the termination can be explained as having been based on the violation of any distribution policy adopted by respondent. The termination was motivated by the ultimatum that respondent received from Hartwell and that ultimatum, in turn, was the culmination of Hartwell's complaints about petitioner's competitive price cutting. The termination was plainly the product of coercion by the stronger of two dealers rather than an attempt to maintain an orderly and efficient system of distribution.[4]

---

[4] "When a manufacturer acts on its own, in pursuing its own market strategy, it is seeking to compete with other manufacturers by imposing what may be defended as reasonable vertical restraints. This would appear to be the rationale of the *GTE Sylvania* decision. However, if the action of a manufacturer or other supplier is taken at the direction of its customer, the restraint becomes primarily horizontal in nature in that one customer is seeking to suppress its competition by utilizing the power of a

In sum, this case does not involve the reasonableness of any vertical restraint imposed on one or more dealers by a manufacturer in its basic franchise agreement. What the jury found was a simple and naked "'agreement between Sharp and Hartwell to terminate Business Electronics because of Business Electronics' price cutting.'" *Ante*, at 722.

## III

Because naked agreements to restrain the trade of third parties are seldom identified with such stark clarity as in this case, there appears to be no exact precedent that determines the outcome here. There are, however, perfectly clear rules that would be decisive if the facts were changed only slightly.

Thus, on the one hand, if it were clear that respondent had acted independently and decided to terminate petitioner because respondent, for reasons of its own, objected to petitioner's pricing policies, the termination would be lawful. See *United States* v. *Parke, Davis & Co.*, 362 U. S. 29, 43–45 (1960). On the other hand, it is equally clear that if respondent had been represented by three dealers in the Houston market instead of only two, and if two of them had threatened to terminate their dealerships "unless respondent ended its relationship with petitioner within 30 days," *ante*, at 721, an agreement to comply with the ultimatum would be an obvious violation of the Sherman Act. See, *e. g.*, *United States* v. *General Motors Corp.*, 384 U. S. 127 (1966); *Klor's, Inc.* v. *Broadway-Hale Stores, Inc.*, 359 U. S. 207 (1959).[5] The

---

common supplier. Therefore, although the termination in such a situation is, itself, a vertical restraint, the desired impact is horizontal and on the dealer, not the manufacturer, level." *Cernuto, Inc.* v. *United Cabinet Corp.*, 595 F. 2d 164, 168 (CA3 1979).

[5] Thus, a boycott "is not to be tolerated merely because the victim is just one merchant whose business is so small that his destruction makes little difference to the economy. Monopoly can as surely thrive by the elimination of such small businessmen, one at a time, as it can by driving them out in large groups." *Klor's, Inc.* v. *Broadway-Hale Stores, Inc.*, 359 U. S.,

question then is whether the two-party agreement involved in this case is more like an illegal three-party agreement or a legal independent decision. For me, the answer is plain.

The distinction between independent action and joint action is fundamental in antitrust jurisprudence.[6] Any at-

---

at 213 (footnote omitted). Again, Judge Adams' analysis in the *Cernuto* opinion, n. 4, *supra*, is relevant:

"The importance of the horizontal nature of this arrangement is illustrated by *United States* v. *General Motors Corp.*, 384 U. S. 127 . . . (1966). Although General Motors, the manufacturer, was seemingly imposing vertical restraints when it pressured recalcitrant automobile dealers not to deal with discounters, the Supreme Court noted that in fact these restraints were induced by the dealers seeking to choke off aggressive competitors at their level, and found a *per se* violation, rejecting the suggestion that only unilateral restraints were at issue. So here, if [the manufacturer and the sales representative acted at the nonterminated dealer's] direction, both the purpose and effect of the termination was to eliminate competition at the retail level, and not, as in *GTE Sylvania*, to promote competition at the manufacturer level. Accordingly, the pro-competitive redeeming virtues so critical in *GTE Sylvania* may not be present here." 595 F. 2d, at 168 (footnote omitted).

As we said in *General Motors:*

"The protection of price competition from conspiratorial restraint is an object of special solicitude under the antitrust laws. We cannot respect that solicitude by closing our eyes to the effect upon price competition of the removal from the market, by combination or conspiracy, of a class of traders. Nor do we propose to construe the Sherman Act to prohibit conspiracies to fix prices at which competitors may sell, but to allow conspiracies or combinations to put competitors out of business entirely." 384 U. S., at 148.

[6] See *United States* v. *Colgate & Co.*, 250 U. S. 300, 307–308 (1919). In *Monsanto Co.* v. *Spray-Rite Service Corp.*, 465 U. S. 752, 761 (1984), we noted that "the basic distinction between concerted and independent action" was "not always clearly drawn by parties and courts." In its opinion today the majority virtually ignores that basic distinction. Thus, *ante*, at 728, the majority discusses the manufacturer's risks arising out of its agreement "with one dealer to terminate another for failure to provide contractually obligated services." But if such a breach of contract has occurred, the manufacturer should have an independent motivation for acting

tempt to define the boundaries of *per se* illegality by the number of parties to different agreements with the same anticompetitive consequences can only breed uncertainty in the law and confusion for the businessman.

More importantly, if instead of speculating about irrelevant vertical nonprice restraints, we focus on the precise character of the agreement before us, we can readily identify its anticompetitive nature.   Before the agreement was made, there was price competition in the Houston retail market for respondent's products.   The stronger of the two competitors was unhappy about that competition; it wanted to have the power to set the price level in the market and therefore it "complained to respondent on a number of occasions about petitioner's prices." *Ante*, at 721.   Quite obviously, if petitioner had agreed with either Hartwell or respondent to discontinue its competitive pricing, there would have been no ultimatum from Hartwell and no termination by respondent. It is equally obvious that either of those agreements would have been illegal *per se*.[7]   Moreover, it is also reasonable to assume that if respondent were to replace petitioner with another price-cutting dealer, there would soon be more complaints and another ultimatum from Hartwell.   Although respondent has not granted Hartwell an exclusive dealership—it retains the right to appoint multiple dealers—its

---

and need not enter into any agreement with a dealer to do so.   As we held in *Monsanto*, the mere fact that the breach of contract may have been called to the manufacturer's attention by another dealer does not make the manufacturer's independent decision to terminate a price-cutting dealer unlawful.

[7] "We have not wavered in our enforcement of the *per se* rule against price fixing." *Arizona* v. *Maricopa County Medical Society*, 457 U. S., at 347.   Thus, in *Dr. Miles Medical Co.* v. *John D. Park & Sons Co.*, 220 U. S. 373 (1911), the Court determined that vertical price fixing is *per se* invalid because resale price maintenance plans serve the profit motives of the dealers, not the manufacturers, and are thereby similar to plans pursuant to which the dealers themselves conspire to fix prices. *Id.*, at 407–408. There is no doubt that horizontal intrabrand price fixing is *per se* illegal, even if the conspirators lack the market power to affect interbrand competition in a manner that would violate the rule of reason.

agreement has protected Hartwell from price competition. Indeed, given the jury's finding and the evidence in the record, that is the *sole function* of the agreement found by the jury in this case. It therefore fits squarely within the category of "naked restraints of trade with no purpose except stifling of competition." *White Motor Co.* v. *United States,* 372 U. S. 253, 263 (1963).

This is the sort of agreement that scholars readily characterize as "inherently suspect."[8] When a manufacturer responds to coercion from a dealer, instead of making an independent decision to enforce a predetermined distribution policy, the anticompetitive character of the response is evident.[9] As Professor Areeda has correctly noted, the fact that the agreement is between only one complaining dealer and the manufacturer does not prevent it from imposing a "horizontal" restraint.[10] If two critical facts are present—a

---

[8] "[S]cenarios that involve a firm or firms at one level of activity using vertical restraints deliberately to confer market power on firms at an adjacent level are inherently suspect. To do so is, typically, to inflict self-injury, just as it would be for consumers to confer market power on the retailers from whom they buy." Baxter, The Viability of Vertical Restraints Doctrine, 75 Calif. L. Rev. 933, 938 (1987).

[9] "Termination responses reflecting the manufacturer's own distribution policy differ greatly from those imposed upon him by a complaining dealer. In the latter case, the manufacturer's compliance with the complainer's demand is more likely to be anticompetitive. There is a superficial resemblance to *Parke Davis* in that three parties are involved, but my earlier analysis suggested that the key to that case was 'complex enforcement,' which is absent where a complaining dealer simply threatens to abandon the manufacturer who continues selling to discounting dealers." 7 P. Areeda, Antitrust Law § 1457, p. 166 (1986).

[10] Commenting on Judge Adams' opinion in *Cernuto,* see nn. 4 and 5, *supra,* Professor Areeda wrote:

"That the complainer was a single firm did not weaken the 'horizontal' characterization. Because the elimination of price competition was the purpose of the complaint and the termination, the court declared that per se illegality would be appropriate. However, the court made clear that no illegal agreement would be found if United was implementing its own unilaterally chosen distribution policy. Thus, the court's implicit theory was that an agreement arose when the manufacturer bowed to the complainer's

naked purpose to eliminate price competition as such and co-ercion of the manufacturer [11]—the conflict with antitrust policy is manifest. [12]

---

will. In that situation, the 'horizontal' characterization is appropriate to capture the fact that dealer interests opposed to those of the manufacturer were being served." Areeda, *supra*, at 174 (footnotes omitted).

See also R. Bork, The Antitrust Paradox 288 (1978):

"A restraint—whether on price, territory, or any other term—is vertical, according to the usage employed here, when a firm operating at one level of an industry places restraints upon rivalry at another level for its own benefit. (This definition excludes restraints, vertical in form only, that are actually imposed by horizontal cartels at any level of the industry, e. g., resale price maintenance that is compelled not by the manufacturer but by the pressure of organized retailers.)"

[11] The two critical facts that had not yet been determined by a jury in the *Cernuto* case are perfectly plain in this case. As Professor Areeda explained:

"The *Cernuto* case was decided on summary judgment which accepted the plaintiff's view of the facts. But two facts critical for the court will often be obscure. *First*, was it the manufacturer's purpose to eliminate price competition as such? Let us assume that termination was not based on such completely independent grounds as non-payment of bills. Even so, the existence of an inevitable price effect does not establish a purpose to control prices in a forbidden way. A purpose to facilitate point-of-sale services or to protect minimum economies of scale could induce a manufacturer to limit intrabrand competition. Notwithstanding price effects, such limitations are lawful when reasonable and not subject to automatic condemnation. Indeed, termination of one dealer in order to grant another exclusive distribution rights in an area is generally lawful. Nevertheless, so long as the manufacturer is not implementing his own interest but that of the complainer, the vice of eliminating 'horizontal' competition with the complainer's rivals seems equally present when the complainer thereby succeeds in eliminating horizontal competition with respect to customers or territories. *Second*, was the manufacturer coerced or was he indulging his own preferences? As we have seen, this question cannot be answered in the abstract. The court correctly acknowledged that the manufacturer might also be implementing his own unilateral vision of optimal distribution without regard to the complainer's desires and held that no illegal agreement would arise if that were the case." Areeda, *supra*, at 174–175 (footnotes omitted).

[12] "Let us defer for the moment problems of proof and assume that a manufacturer does not wish to terminate the plaintiff dealer but does so to

Indeed, since the economic consequences of Hartwell's ultimatum to respondent are identical to those that would result from a comparable ultimatum by two of three dealers in a market—and since a two-party price-fixing agreement is just as unlawful as a three-party price-fixing agreement—it is appropriate to employ the term "boycott" to characterize this agreement. In my judgment the case is therefore controlled by our decision in *United States* v. *General Motors Corp.*, 384 U. S. 127 (1966).

The majority disposes quickly of both *General Motors* and *Klor's, Inc.* v. *Broadway-Hale Stores, Inc.*, 359 U. S. 207 (1959), by concluding that "both cases involved horizontal combinations." *Ante*, at 734. But this distinction plainly will

---

placate the complaining dealer, who would otherwise cease handling the product. This manufacturer would rather keep both dealers but, when forced to choose between them, concludes that terminating the plaintiff hurts him less (considering sales lost, transaction costs in finding and perhaps training a replacement, and any spillover effects upon his relations with other dealers) than losing the complainer's patronage.

"The present situation is *Colgate* in reverse. In *Colgate*, it was the supplier who was controlling the dealer's behavior. Here a dealer is conditioning his patronage in a way that controls the manufacturer's behavior. The agreement concept seems parallel. But the economic effects can be very different. From the policy viewpoint, it can matter greatly whether manufacturer or dealer interests are being served. The former is more likely to seek efficient distribution, which stimulates interbrand competition; the latter is more likely to seek excess profits, which dampen interbrand competition. Accordingly, antitrust policy can be more hospitable toward manufacturer efforts to control dealer prices, customers, or territories than toward the efforts of dealers to control *their* competitors through the manufacturer.

"Of course, manufacturer and dealer interests are not necessarily antagonistic. Like the manufacturer, dealers might also believe that restricted distribution increases dealer services and sales and thus strengthens interbrand competition. However, this objective seems unlikely when the manufacturer is forced to violate the distribution policy he thinks best. Although he might be mistaken about what his optimal distribution policy ought to be, he should be presumed a better judge of that than coercing dealers who always desire excess profits unnecessary for efficient distribution." Areeda, *supra*, at 167–168 (footnotes omitted).

not suffice. In *General Motors*, a group of Chevrolet dealers conspired with General Motors to eliminate sales from the manufacturer to discounting dealers. We held that "[e]limination, by joint collaborative action, of discounters from access to the market is a *per se* violation of the Act," 384 U. S., at 145, and explained that "inherent in the success of the combination in this case was a substantial restraint upon price competition—a goal unlawful *per se* when sought to be effected by combination or conspiracy." *Id.*, at 147. Precisely the same goal was sought and effected in this case—the elimination of price competition at the dealer level. Moreover, the method of achieving that goal was precisely the same in both cases—the manufacturer's refusal to sell to discounting dealers. The difference between the two cases is not a difference between horizontal and vertical agreements—in both cases the critical agreement was between market actors at the retail level on the one hand and the manufacturer level on the other. Rather, the difference is simply a difference in the number of conspirators. Hartwell's coercion of respondent in order to eliminate petitioner because of its same-level price competition is not different in kind from the Chevrolet dealers' coercion of General Motors in order to eliminate other, price-cutting dealers; the only difference between the two cases—one dealer seeking a naked price-based restraint in today's case, many dealers seeking the same end in *General Motors*—is merely a difference in degree. Both boycotts lack any efficiency justification—they are simply naked restraints on price competition, rather than integral, or ancillary, parts of the manufacturers' predetermined distribution policies.

## IV

What is most troubling about the majority's opinion is its failure to attach any weight to the value of intrabrand competition. In *Continental T. V., Inc.* v. *GTE Sylvania Inc.*,

433 U. S. 36 (1977), we correctly held that a demonstrable
benefit to interbrand competition will outweigh the harm to
intrabrand competition that is caused by the imposition of
vertical nonprice restrictions on dealers. But we also ex-
pressly reaffirmed earlier cases in which the illegal conspir-
acy affected only intrabrand competition.[13] Not a word in
the *Sylvania* opinion implied that the elimination of intra-
brand competition could be justified as reasonable without
any evidence of a purpose to improve interbrand competition.

In the case before us today, the relevant economic market
was the sale at retail in the Houston area of calculators manu-
factured by respondent.[14] There is no dispute that an agree-

---

[13] See 433 U. S., at 58, n. 28 (citing *United States* v. *General Motors
Corp.*, 384 U. S. 127 (1966), and *United States* v. *Topco Associates, Inc.*,
405 U. S. 596 (1972)).

[14] It might be helpful to note at this point that although the majority
mentions only the reduction of *inter*brand competition as a justification for
a *per se* rule against vertical price restraints, see *ante*, at 725–726, our
opinion in *Sylvania* was quite different. As we stated then:

"The market impact of vertical restrictions is complex because of their
potential for a simultaneous reduction of intrabrand competition and stimu-
lation of interbrand competition. Significantly, the Court in *Schwinn* did
not distinguish among the challenged restrictions on the basis of their in-
dividual potential for intrabrand harm or interbrand benefit. Restrictions
that completely eliminated intrabrand competition among Schwinn distrib-
utors were analyzed no differently from those that merely moderated in-
trabrand competition among retailers." 433 U. S., at 51–52 (footnotes
omitted).

In the following pages, we pointed out that because vertical nonprice re-
strictions imposed by manufacturers may serve to advance interbrand com-
petition, the restriction on intrabrand competition should be subject only
to a rule of reason analysis. Along these same lines, we explained that
"[e]conomists also have argued that manufacturers have an economic in-
terest in maintaining as much intrabrand competition as is consistent with
the efficient distribution of their products." *Id.*, at 56. Thus, although
the majority neglects to mention it, fostering intrabrand competition has
been recognized as an important goal of antitrust law, and although a man-
ufacturer's efficiency-enhancing vertical nonprice restraints may subject
a reduction of intrabrand competition only to a rule of reason analysis, a

ment to fix prices in that market, either horizontally between petitioner and Hartwell or vertically between respondent and either or both of the two dealers, would violate the Sherman Act. The "quite plausible" assumption, see *ante*, at 729, that such an agreement might enable the retailers to provide better services to their customers would not have avoided the strict rule against price fixing that this Court has consistently enforced in the past.

---

similar reduction without the procompetitive "redeeming virtues" of manufacturer-imposed vertical nonprice restraints, *id.*, at 54, causes nothing but economic harm. As one commentator has recently stated:

"Intrabrand competition can benefit the consumer, and it is therefore important to insure that a manufacturer's motive for a vertical restriction is not simply to acquiesce in his distributors' desires to limit competition among themselves. The Supreme Court has recognized that restrictions on intrabrand competition can only be tolerated because of the countervailing positive impact on interbrand competition." Piraino, The Case for Presuming the Legality of Quality Motivated Restrictions on Distribution, 63 Notre Dame L. Rev. 1, 17 (1988) (footnotes omitted).

See also H. R. Rep. No. 100–421, pp. 23, 38 (1987) (accompanying bill H. R. 585, the Freedom from Vertical Price Fixing Act of 1987, passed by the House and currently pending before the Senate; criticizing the Fifth Circuit's decision in this case, and restating "plainly and unequivocally that *all forms* of resale price maintenance are illegal per se under the antitrust laws," including "where a conspiracy exists between a supplier and distributor to terminate or cut off supply to a second distributor because of the second distributor's pricing policies") (emphasis in original); Departments of Commerce, Justice, and State, the Judiciary and Related Agencies Appropriation Act, 1986, Pub. L. 99–180, 99 Stat. 1169–1170 (congressional resolution that Department of Justice Vertical Restraints Guidelines "are inconsistent with established antitrust law, . . . in maintaining that such policy guidelines do not treat vertical price fixing when, in fact, some provisions of such policy guidelines suggest that certain price fixing conspiracies are legal if such conspiracies are 'limited' to restricting intrabrand competition; . . . in stating that vertical restraints that have an impact upon prices are subject to the per se rule of illegality only if there is an 'explicit agreement as to the specific prices'"); Report of Attorney General's National Committee to Study the Antitrust Laws 149–155 (1955) (criticizing laws that permit resale price maintenance as a "throttling of price competition in the process of distribution").

Under petitioner's theory of the case, an agreement between respondent and Hartwell to terminate petitioner because of its price cutting was just as indefensible as any of those price-fixing agreements. At trial the jury found the existence of such an agreement to eliminate petitioner's price competition. Respondent had denied that any agreement had been made and asked the jury to find that it had independently decided to terminate petitioner because of its poor sales performance,[15] but after hearing several days of testimony, the jury concluded that this defense was pretextual.

Neither the Court of Appeals nor the majority questions the accuracy of the jury's resolution of the factual issues in this case. Nevertheless, the rule the majority fashions today is based largely on its concern that in other cases juries will be unable to tell the difference between truthful and pretextual defenses. Thus, it opines that "even a manufacturer that agrees with one dealer to terminate another for failure to provide contractually obligated services, exposes itself to the highly plausible claim that its real motivation was to terminate a price cutter." *Ante*, at 728. But such a "plausible" concern in a hypothetical case that is so different from this one should not be given greater weight than facts that can be established by hard evidence. If a dealer has, in fact, failed to provide contractually obligated services, and if the manufacturer has, in fact, terminated the dealer for that reason, both of those objective facts should be provable by admissible

---

[15] The court instructed the jury:

"Sharp, on the other hand, contends that it terminated Business Electronics unilaterally, not as a result of any agreement or understanding with Hartwell, but because of Business Electronics' sales performance. If you find that Sharp did not terminate Business Electronics pursuant to an agreement or understanding with Hartwell to eliminate price cutting by Business Electronics, then you should answer 'no' to question number 1." 22 Record 1587.

See also nn. 18–19, *infra*.

evidence.[16]  Both in its disposition of this case and in its attempt to justify a new approach to agreements to eliminate price competition, the majority exhibits little confidence in the judicial process as a means of ascertaining the truth.[17]

---

[16] In *Morrison* v. *Murray Biscuit Co.*, 797 F. 2d 1430 (CA7 1986), cited *ante*, at 720, n. 1, Morrison, a wholesale distributor, sued Murray Biscuit, a producer of cookies and crackers, charging a conspiracy between Murray Biscuit and Feldman, a food broker, to suppress price competition between Feldman and Morrison.  797 F. 2d, at 1431.  But it was quite clear that Murray Biscuit "had assigned particular customers to particular middlemen, whether brokers [like Feldman] or warehouse distributors [like Morrison]."  *Id.*, at 1435.  Judge Posner's opinion explained:

"Suppose that after *Sylvania* was decided, a seller that had a price-fixing agreement (illegal per se) with its dealers adopted a lawful customer allocation agreement pursuant to which it terminated a dealer.  That dealer could not sue for price fixing, even if the price-fixing agreement had never been rescinded, *unless he could show that his breach of the customer allocation agreement was not the real reason for his termination; maybe the agreement was a mask behind which the illegal price fixing continued.* The reason for Morrison's termination was that he tried to take away a customer who had been assigned to Feldman; there is no indication that the assignment was a mask for resale price maintenance.  Since Feldman had the exclusive right to sell Murray Biscuit's products to the Certified account, Morrison had no business selling to Certified at any price." *Id.*, at 1439 (emphasis added).

Judge Posner thus made it clear that although Morrison had been terminated pursuant to a valid vertical nonprice restraint, a terminated dealer might prevail if it could prove that the nonprice agreement was "a mask behind which the illegal price fixing continued."  *Ibid.*

[17] "When faced with conflicting evidence, the jury must determine whether the nonprice justifications for the termination advanced by the defendant are legitimate, or are mere pretext to disguise a per se illegal agreement with the nonterminated dealer to maintain resale prices.  It is the Court's duty under *Monsanto* to decide whether sufficient evidence was presented for a jury to make that determination." *McCabe's Furniture, Inc.* v. *La-Z-Boy Chair Co.*, 798 F. 2d 323, 329 (CA8 1986), cited *ante*, at 720, n. 1.

See also L. Sullivan, Law of Antitrust 202 (1977) ("A shorthand method which may help to identify a restraint affecting price as naked is to examine the arguments which are being pressed in justification of the practice").

The majority fails to consider that manufacturers such as respondent will only be held liable in the rare case in which the following can be proved: First, the terminated dealer must overcome the high hurdle of *Monsanto Co.* v. *Spray-Rite Service Corp.*, 465 U. S. 752 (1984). A terminated dealer must introduce "evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently." *Id.*, at 764. Requiring judges to adhere to the strict test for agreement laid down in *Monsanto*, in their jury instructions or own findings of fact, goes a long way toward ensuring that many legitimate dealer termination decisions do not succumb improperly to antitrust liability.[18]

Second, the terminated dealer must prove that the agreement was based on a purpose to terminate it because of its price cutting. Proof of motivation is another commonplace in antitrust litigation of which the majority appears apprehensive, but as we have explained or demonstrated many times, see, *e. g.*, *Aspen Skiing Co.* v. *Aspen Highlands Ski-*

---

[18] Although at trial respondent had asked the jury to find that it had acted independently, see n. 15, *supra*, and accompanying text, respondent has not disputed, either in the Court of Appeals or here, the jury's finding of an agreement. (Respondent has, of course, contended that no agreement was reached requiring some level of resale price maintenance. As I have argued, though, such an agreement is not needed to invoke the *per se* rule in a case such as this.) Respondent did argue before the District Court for an instruction explaining that "it must be shown that the manufacturer agreed with the complaining dealer to terminate the existing dealer and that, in so agreeing, the manufacturer shared with the complaining dealer the same desire of eliminating price competition for the complaining dealer." 1 Record 151. Respondent later objected to the court's decision not to give this instruction, *id.*, at 54, 22 Record 1599, but the court in fact had quite carefully explained to the jury that "[w]hat a preponderance . . . of the evidence in the case must show in order to establish the existence of the required combination, agreement, or understanding is that Sharp and Hartwell knowingly came to a common and mutual understanding to accomplish or to attempt to accomplish an unlawful purpose." *Id.*, at 1584–1585.

*ing Corp.*, 472 U. S. 585, 610–611 (1985); *McLain* v. *Real Estate Board of New Orleans, Inc.*, 444 U. S. 232, 243 (1980); *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150, 224–226, n. 59 (1940); *Chicago Board of Trade* v. *United States*, 246 U. S. 231, 238 (1918); see also Piraino, The Case for Presuming the Legality of Quality Motivated Restrictions on Distribution, 63 Notre Dame L. Rev. 1, 4, 16–19 (1988), in antitrust, as in many other areas of the law, motivation matters and factfinders are able to distinguish bad from good intent.

Third, the manufacturer may rebut the evidence tending to prove that the sole purpose of the agreement was to eliminate a price cutter by offering evidence that it entered the agreement for legitimate, nonprice-related reasons.

Although in this case the jury found a naked agreement to terminate a dealer because of its price cutting, *ante*, at 721–722, the majority boldly characterizes the same agreement as "this nonprice vertical restriction." *Ante*, at 729. That characterization is surely an oxymoron when applied to the agreement the jury actually found. Nevertheless, the majority proceeds to justify it as "ancillary" to a "quite plausible purpose . . . to enable Hartwell to provide better services under the sales franchise agreement." *Ibid.* There are two significant reasons why that justification is unacceptable.

First, it is not supported by the jury's verdict. Although it did not do so with precision, the District Court did instruct the jury that in order to hold respondent liable it had to find that the agreement's purpose was to eliminate petitioner because of its price cutting and that no valid vertical nonprice restriction existed to which the motivation to eliminate price competition at the dealership level was merely ancillary.[19]

---

[19] The Court instructed the jury:

"The Sherman Act is violated when a seller enters into an agreement or understanding with one of its dealers to terminate another dealer because of the other dealer's price cutting. Plaintiff contends that Sharp termi-

Second, the "quite plausible purpose" the majority hypothesizes as salvation for the otherwise anticompetitive elimination of price competition—"to enable Hartwell to provide better services under the sales franchise agreement," *ibid.*,—is simply not the type of concern we sought to protect in *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S. 36 (1977). I have emphasized in this dissent the difference between restrictions imposed in pursuit of a manufacturer's structuring of its product distribution, and those imposed at the behest of retailers who care less about the general efficiency of a product's promotion than their own profit margins. *Sylvania* stressed the importance of the former, not the latter; we referred to the use that *manufacturers* can

---

nated Business Electronics in furtherance of Hartwell's desire to eliminate Business Electronics as a price-cutting rival.

"If you find that there was an agreement between Sharp and Hartwell to terminate Business Electronics because of Business Electronics' price cutting, you should answer 'yes' to question number 1.

"Sharp, on the other hand, contends that it terminated Business Electronics unilaterally, not as a result of any agreement or understanding with Hartwell, but because of Business Electronics' sales performance. If you find that Sharp did not terminate Business Electronics pursuant to an agreement or understanding with Hartwell to eliminate price cutting by Business Electronics, then you should answer 'no' to question number 1." 22 Record 1587.

Respondent had asked for an instruction requiring the jury to consider circumstantial evidence as proof of a motivation to eliminate price competition only if such evidence could not "equally be interpreted to show that Sharp terminated Business Electronics Corporation for other business reasons and not pursuant to any agreement with Mr. Hartwell to fix resale prices of calculators." 1 Record 148. Respondent objected to the failure to give this instruction, *id.*, at 54, and also objected, more specifically, to the instruction that was given on the ground that "it allows the jury to find against the defendant even if they do not believe that Sharp cared about [Business Electronics'] price cutting or if they believe that Sharp had a dual motive in making the termination." 22 Record 1599. The instruction quoted above, though, makes it highly unlikely that the jury would have found for petitioner although finding respondent's motives to be mixed ones.

make of vertical nonprice restraints, see *id.*, at 54–57, and nowhere did we discuss the benefits of permitting dealers to structure intrabrand competition at the retail level by coercing manufacturers into essentially anticompetitive agreements. Thus, while Hartwell may indeed be able to provide better services under the sales franchise agreement with petitioner out of the way, one would not have thought, until today, that the mere possibility of such a result—at the expense of the elimination of price competition and absent the salutary overlay of a manufacturer's distribution decision with the entire product line in mind—would be sufficient to legitimate an otherwise purely anticompetitive restraint. See n. 14, *supra.* In fact, given the majority's total reliance on "economic analysis," see *ante,* at 735, it is hard to understand why, if such a purpose were sufficient to avoid the application of a *per se* rule in this context, the same purpose should not also be sufficient to trump the *per se* rule in all other price-fixing cases that arguably permit cartel members to "provide better services."

If, however, we continue to accept the premise that competition in the relevant market is worthy of legal protection— that we should not rely on competitive pressures exerted by sellers in other areas and purveyors of similar but not identical products—and if we are faithful to the competitive philosophy that has animated our antitrust jurisprudence since Judge Taft's opinion in *Addyston Pipe,* we can agree that the elimination of price competition will produce wider gross profit margins for retailers, but we may not assume that the retailer's self-interest will result in a better marketplace for consumers.

> "The Sherman Act reflects a legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services. 'The heart of our national economic policy long has been faith in the value of competition.' *Standard Oil Co.* v. *FTC,* 340 U. S. 231, 248. The assumption that competition is the best

method of allocating resources in a free market recognizes that all elements of a bargain—quality, service, safety, and durability—and not just the immediate cost, are favorably affected by the free opportunity to select among alternative offers. Even assuming occasional exceptions to the presumed consequences of competition, the statutory policy precludes inquiry into the question whether competition is good or bad." *National Society of Professional Engineers* v. *United States*, 435 U. S., at 695.

The "plausible purpose" posited by the majority as its sole justification for this mischaracterized "nonprice vertical restriction" is inconsistent with the legislative judgment that underlies the Sherman Act itself. Under the facts as found by the jury in this case, the agreement before us is one whose "sole object is to restrain trade in order to avoid the competition which it has always been the policy of the common law to foster." *United States* v. *Addyston Pipe & Steel Co.*, 85 F., at 283.

V

In sum, this simply is not a case in which procompetitive vertical nonprice restraints have been imposed; in fact, it is not a case in which *any* procompetitive agreement is at issue.[20] The sole purpose of the agreement between re-

---

[20] Thus, the Courts of Appeals decisions cited by the majority as supporting its view, see *ante*, at 720, n. 1, are, in fact, consistent with the rule that a naked intent to eliminate price competition is *per se* invalid. Each of the opinions contains a discussion that distinguishes between, on the one hand, an agreement between manufacturer and dealer to eliminate a price-cutting competitor based solely on an intent to eliminate price competition, and, on the other hand, an agreement between manufacturer and dealer to eliminate a price-cutting competitor that is grounded not only in an antipathy to price competition, but also in a purpose to implement a procompetitive system of vertical nonprice restraints. See *McCabe's Furniture, Inc.* v. *La-Z-Boy Chair Co.*, 798 F. 2d, at 329–330; *Morrison* v. *Murray Biscuit Co.*, 797 F. 2d, at 1439–1440; *Westman Commission Co.* v. *Hobart Int'l, Inc.*, 796 F. 2d 1216, 1223 (CA10 1986). Moreover, none of

spondent and Hartwell was to eliminate price competition at Hartwell's level. As Judge Bork has aptly explained:

> "Since the naked boycott is a form of predatory behavior, there is little doubt that it should be a per se violation of the Sherman Act." Bork, The Antitrust Paradox, at 334.

I respectfully dissent.

---

these opinions proposes the rule that the majority sanctions today: that an agreement as to some level of resale price maintenance is necessary for invocation of the *per se* rule in these situations.