**TOYS "R" US, INC., Plaintiff,**

v.

**R.H. MACY & CO., INC. Defendant.**

**No. 88 Civ. 0241 (TPG).**

United States District Court, S.D. New York.

Jan. 8, 1990.

Irving Scher, Weil, Gotshal & Manges, New York City, for plaintiff.

Michael S. Feldberg, Shea & Gould, New York City, for defendant.

## OPINION

GRIESA, District Judge.

This is an action based on Section 1 of the Sherman Act, 15 U.S.C. § 1, and certain related state law theories. The claim is that defendant Macy conspired with manufacturers of children's swimwear to have these manufacturers cut off certain sales to a chain of discount children's clothing stores known as Kids "R" Us, a division of plaintiff Toys "R" Us.

Macy moves for summary judgment dismissing the Sherman Act claims. Macy further contends that with the antitrust claims disposed of there is no basis for asserting jurisdiction over the state law claims, and that these should also be dismissed.

Macy's motion is granted in all respects.

## PLAINTIFF'S ALLEGATIONS

It is appropriate at the outset to analyze the precise antitrust theories espoused by plaintiff.

Counts I and II of the four-count amended complaint are under Sherman Act § 1. Count I alleges that Macy's activities in preventing certain manufacturers from selling to plaintiff constituted a conspiracy "to fix and/or maintain prices in the retail children's swimwear market" (par. 27). Count II alleges that the activities of Macy and of the manufacturers constituted a "boycott" of plaintiff intended to "eliminate price competition with KIDS and/or eliminate competition with KIDS" (par. 33).

Plaintiff's brief in opposition to the summary judgment motion elaborates on these claims of price fixing and boycott. Plaintiff's case is based solely on alleged *per se*

violations of the Sherman Act. Plaintiff is not making any claims based on a "rule-of-reason" analysis.

Plaintiff poses a third theory in its brief, not articulated in the complaint (Memorandum of Law of June 5, 1989 pp. 64–70). After arguing that Macy instigated a vertical price-fixing arrangement, plaintiff contends that even if this is not proved, Macy still has *per se* liability, since it brought about vertical nonprice restraints which decreased both intrabrand competition and interbrand competition.

## FACTS

The facts have been thoroughly developed in extensive discovery, including depositions of representatives of plaintiff, of Macy, and of the swimwear manufacturers. In light of the discovery, most of the essential facts are not contested. To the extent that there are conflicts, the evidence will be viewed in the light most favorable to plaintiff.

Plaintiff's division, Kids "R" Us ("Kids"), is a nationwide discount retailer of children's clothing, including swimwear. It has over 100 stores and generates over $300 million per year in sales. Its marketing strategy is to sell at discounts of 20% to 25% below the prices charged by full-price stores.

Defendant Macy has a chain of department stores operating nationwide. The primary focus in this action is upon the activities of a subsidiary, Macy's New Jersey, which operates 26 stores in New Jersey, New York, Pennsylvania, Maryland and Delaware. These stores are in competition with a number of stores operated by Kids. Hereafter "Macy" will refer to Macy's New Jersey.

Macy offers a wide variety of items, including children's swimwear. Macy traditionally prices its merchandise at "keystone" prices—an industry term usually referring to a retail price which is approximately twice the manufacturer's wholesale price. However, in 1986 Macy adopted a special pricing policy for children's clothing. Under this policy Macy would meet

any retail price of children's wear offered by a competitor where "like merchandise" was involved—*i.e.*, merchandise like that sold by Macy.

In 1987 Kids decided to expand its swimwear offerings to include high-quality children's fashion swimwear. A buyer for Kids, Patricia Stewart, started having discussions with swimwear manufacturers. Two of these were Backflips and Little Dippers. Stewart dealt with Larry Yelin at Backflips and Jane Ross at Little Dippers.

The discussions held in 1987 pertained to the 1988 lines of merchandise. Yelin offered to sell Kids any and all of Backflips' lines. However, Ross would not give a definite answer about Little Dippers and expressed concern about dealing with a discount retailer.

During the early fall of 1987 Kids placed a telephone order for swimwear with Backflips. Kids sent Little Dippers a written purchase order. Although there is an issue about what precise response Little Dippers made, for purposes of this motion it will be assumed that Little Dippers accepted the order.

Harold Platt, the buyer for children's swimwear for Macy's New Jersey, was somehow alerted to the prospective dealings of Backflips and Little Dippers with Kids and made inquiries of Yelin at Backflips and Ross at Little Dippers as to whether they intended to sell to Kids. Platt complained to each that it was very difficult for Macy to meet Kids' prices. In separate conversations with Yelin and Ross, he reminded them of Macy's sizable purchases from their companies in the past, and stated that he was considering placing larger orders for 1988. He told them, however, that if they sold to Kids, Macy could well reduce or eliminate entirely its business with these firms.

Platt contemplated that if Backflips and Little Dippers sold to Kids, and if Kids sold at its customary discount, Macy would, under its own policy, depart from its keystone pricing on this swimwear and meet Kids' prices. Platt was concerned about the effect on profits with respect to the goods he was responsible for.

In mid-November 1987 Backflips and Little Dippers advised Kids that neither firm would sell its primary line of high-quality swimwear to Kids. Yelin explained to Kids that Backflips was acting in response to complaints by Macy and other full-price retailers. Ross at first gave Kids a false excuse, but later stated that Little Dippers was responding to the complaints of Macy and other full-price stores.

Aside from these references to other retailers in the statements to Kids by Yelin and Ross, there is no evidence in the record about complaints from retailers other than Macy. Neither Yelin nor Ross has testified about any actual approaches by such other retailers. For purposes of this motion, it will be assumed that the sole precipitating cause of Backflips' and Little Dippers' refusal to sell certain lines of swimwear to Kids was the protest by Macy.

In advising Kids that they would not sell their primary lines, both Backflips and Little Dippers indicated that they would sell certain lower quality swimwear to Kids, which offer Kids rejected. However, Kids later decided to accept Backflips' offer regarding the lower quality merchandise. Oddly enough, Kids asked Yelin to obtain Platt's permission to do this.

Yelin advised Platt that Backflips was not selling its primary line to Kids and asked Platt's consent to sell Kids the secondary line. After some discussion Platt gave this permission.

Ross of Little Dippers advised Platt that Little Dippers was refusing to sell Kids the merchandise which Kids had ordered.

In late November 1987 Macy placed orders with Backflips and Little Dippers for 1988, which were for substantially greater quantities of swimwear than had been purchased the prior year.

Yelin and Ross were friends and informed each other of what they were doing *vis a vis* Macy. However, there is no indication that this was more than an exchange of information. There is no evidence that Backflips and Little Dippers made any agreement with each other about not selling to Kids. Each company acted indepen-

dently of the other in response to pressure by Macy.

There is evidence in the record about another manufacturer, Catalina. Kids approached Catalina in the fall of 1987 and Catalina expressed reservations about dealing with a discounter. Platt of Macy inquired of Catalina whether it intended to sell to Kids. It appears that Catalina had already decided not to sell to Kids and so advised Platt. There is no evidence that Catalina's decision was the result of pressure from Macy or involved any agreement with Macy.

In connection with plaintiff's price-fixing claim, the court makes the following findings. There is no evidence of participation in such a price-fixing agreement by any retailer other than Macy. There is no evidence that any other retailers agreed to, or acquiesced in, the so-called "keystone prices" which Macy was seeking to protect. The evidence shows that Backflips and Little Dippers sold their high quality merchandise to a discount retailer named Marshall's, and other discount retailers, for resale in the 1988 season. In the lengthy discussion of the evidence in plaintiff's brief, it is clear that the only real claim of price fixing is that Macy fixed *its own prices*. To be sure, at one point plaintiff argues that, with Kids unable to buy certain swimwear, fewer retailers carry this swimwear and "those that do offer it only at the high price secured by Macy" (Memorandum of Law p. 65). However, no evidence in support of this assertion is cited. Elsewhere in plaintiff's brief, when price fixing is discussed, the only prices mentioned are those of Macy (pp. 4–5, 49, 52).

Even as to Macy's prices, there is nothing in the record to indicate that Macy agreed with either Backflips or Little Dippers as to a level of retail prices which Macy would charge. Nothing suggests that the manufacturers were seeking to establish such a level of retail prices. It was Macy who was seeking to protect its own keystone prices. In any event, it was Macy's decision, and its decision alone, which determined Macy's prices. Macy made no commitment to Backflips or Little

Dippers as to these prices, nor did these manufacturers seek any such commitment.

This lawsuit was commenced on January 14, 1988. Intensive discovery occurred in 1988 and early 1989. Macy's motion for summary judgment was filed in May 1989. The evidence relied upon by both sides relates to the events occurring in the fall of 1987 dealing with the swimwear selling season of 1988.

## DISCUSSION

Summary judgment will be granted where the moving party demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Macy's motion for summary judgment may be disposed of on the basis of two recent Supreme Court decisions, *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), and *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). Both sides recognize that these decisions are pivotal, but strongly disagree as to their effect on the present case. As will be described, the court believes that they require dismissal of plaintiff's Sherman Act claims.

*Monsanto v. Spray–Rite* dealt with the relationship between a manufacturer and its distributors. Monsanto had a system of appointing distributors of herbicides based on certain criteria, including the ability to exploit the market in a geographic area and to educate customers in the technical aspects of Monsanto herbicides. Spray–Rite was an authorized distributor for many years. However, Spray–Rite was a discounter. There was evidence indicating that competing distributors complained to Monsanto about Spray–Rite's prices and that Monsanto made threats to terminate Spray–Rite unless it raised its prices. Spray–Rite's distributorship was in fact terminated, leading to a suit against Monsanto under Sherman Act § 1, alleging a price-fixing conspiracy between Monsanto and other distributors.

The case was tried to a jury, which found, in answers to special interrogatories, that the termination of Spray–Rite was pursuant to a conspiracy between Monsanto and one or more of its distributors to set resale prices. Judgment was entered in favor of Spray–Rite. The Seventh Circuit affirmed, reasoning that "proof of termination following competitor complaints is sufficient to support an inference of concerted action." 684 F.2d 1226, 1238.

The Supreme Court made a dual holding. First, it rejected the reasoning of the Seventh Circuit that the complaints of competing distributors followed by termination of the price-cutting distributor are sufficient to support a finding of concerted action under Sherman Act § 1, which requires that there be a "contract, combination ... or conspiracy" between two or more parties in order to establish a violation. The Supreme Court agreed with the view previously taken by various circuits, including the Second, that "something more than evidence of complaints is needed." 465 U.S. at 764, 104 S.Ct. at 1471. The Court went on to hold:

> The correct standard is that there must be evidence that tends to exclude the possibility of independent action by the manufacturer and distributor. That is, there must be direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective.

465 U.S. at 768, 104 S.Ct. at 1473.

The second part of the dual holding in *Monsanto* was to affirm the judgment of the district court on the basis of the standard which the Court held to be the proper one. The Court held that there was sufficient evidence for the jury to have found that Monsanto and some of its distributors were parties to an agreement or conspiracy to maintain resale prices and terminate price cutters. *Id.* at 765, 104 S.Ct. at 1471. The Court cited evidence that, following the termination of Spray–Rite, Monsanto advised certain price-cutting distributors

that if they did not maintain the suggested resale price they would not receive adequate supplies of herbicide. There was evidence that, when one of these distributors did not assent, its parent company instructed it to comply, and that this distributor informed Monsanto that it would charge the suggested price. There was also a newsletter issued by one of the distributors to his customers stating that "those of us on the distributor level are not likely to deviate downward." The newsletter referred to "the wisdom of participating in the suggested program," and to "following the rules of the game." The Court found that this evidence indicated a meeting of the minds as to an agreement or understanding that distributors and retailers would maintain prices. *Id.* at 765–66, 104 S.Ct. at 1471–72. Thus, in the *Monsanto* case there was not merely the termination of one distributor upon the complaints of others, but there was an affirmative showing of a price-fixing agreement among Monsanto and the remaining distributors.

In the present case there is no showing of this kind. Although the evidence might justify the finding of agreements between Macy on the one hand and Backflips and Little Dippers on the other to deny certain merchandise to Kids, there is no indication of any agreement by distributors or manufacturers or any combination of the two groups to set prices or price levels.

■ This leaves the question of whether an agreement by Macy and a manufacturer to have the manufacturer deny merchandise to Kids would, in and of itself, be sufficient to prove a *per se* Sherman Act violation even without a price-fixing agreement. This question is answered in the negative by the Supreme Court's decision in *Business Electronics v. Sharp, supra.* That case involved a manufacturer of computers, Sharp, which published a list of suggested minimum retail prices. However, Sharp's dealership agreements did not obligate the dealers to observe such prices. Business Electronics was an appointed retail dealer of Sharp products. Hartwell was a competing dealer. Both

Business Electronic and Hartwell at times sold at prices below Sharp's suggested prices. The prices of Business Electronics were generally below those of Hartwell. Hartwell complained to Sharp about Business Electronics' prices and finally gave Sharp an ultimatum that Hartwell would terminate his dealership unless Sharp ended its relationship with Business Electronics in thirty days. Sharp promptly terminated Business Electronics.

Business Electronics sued Sharp under § 1 of the Sherman Act. The case was tried to a jury. The essential part of the district court's instruction to the jury was that the Sherman Act is violated when a seller enters into an agreement with one of its dealers to terminate another dealer because of the other dealer's price cutting. The jury found that there was such an agreement, and judgment was entered for Business Electronics. The district court made no finding of a price-fixing agreement as a predicate for liability. The Fifth Circuit reversed and remanded for a new trial, holding that there could be no liability in the case without a finding of an express or implied agreement to set resale prices at some level. 780 F.2d 1212, 1218.

In *Sharp*, as in the present case, the plaintiff sought to recover solely on a theory of *per se* Sherman Act violation, making no claim based on a rule-of-reason analysis. Thus, the issue before both the Fifth Circuit and the Supreme Court was whether the district court had applied the correct rule of law regarding *per se* Sherman Act liability.

The majority opinion of the Supreme Court stated the issue as involving "the proper dividing line between the rule that vertical price restraints are illegal *per se* and the rule that vertical nonprice restraints are to be judged under the rule of reason." 485 U.S. at 720, 108 S.Ct. at 1517. The Court affirmed the circuit, holding that "a vertical restraint is not illegal *per se* unless it includes some agreement on price or price levels." *Id.* at 735–36, 108 S.Ct. at 1525. An agreement to terminate a price cutter is not, in and of itself, a price-fixing agreement.

There has been no showing here that an agreement between a manufacturer and a dealer to terminate a "price cutter," without a further agreement on the price or price levels to be charged by the remaining dealer, almost always tends to restrict competition and reduce output. *Id.* at 726–27, 108 S.Ct. at 1521.

The Court also refused to impose liability under the rule that there is *per se* illegality when there is a group boycott of a dealer because of that dealer's price cutting. *See Klor's Inc. v. Broadway Hall Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). The Court reasoned that the group boycott cases involve "horizontal combinations," something not present in the *Sharp* case, where the combination was between a manufacturer and a dealer and was thus a vertical one. 485 U.S. at 734, 108 S.Ct. at 1525.

The *Sharp* decision eliminates any possibility of plaintiff prevailing in the present case. It is true that there are certain factual distinctions between the case at bar and *Sharp*. *Sharp* was a suit against the manufacturer. The present case is a suit against the complaining retailer. *Sharp* involved the termination of an appointed dealer. The present case involves wholesale trade without appointed dealerships. However, these are not differences of substance. What is essential are the similarities. Here, as in *Sharp*, the combinations, if there were such, were vertical—*i.e.*, between a retailer and manufacturers. The "restraints," if there were such, were vertical—*i.e.*, the potential restraint imposed by manufacturers upon the price cutter, Kids. The rule of *Sharp* governs the present case. There can be no *per se* Sherman Act liability for a vertical combination or a vertical restraint without a showing of an agreement setting prices or price levels. As already described, there is no showing of any such agreement.

There is another similarity between *Sharp* and the present case which deserves comment. In both cases the instigator was a large dealer which coerced a manufacturer or manufacturers to terminate a rival discounting dealer. However, the majority

**236**

opinion in *Sharp* devotes its entire discussion of policy considerations to the economic desirability of protecting the ability of *manufacturers* to fashion distribution systems of their own choosing. The opinion discusses "legitimate and competitively useful conduct" on the part of manufacturers to ensure adequate services by dealers and to prevent "free-riding" by discounters. 485 U.S. at 727–31, 108 S.Ct. at 1521. The majority devotes no attention to the question of how a *dealer* is economically justified in pressuring a manufacturer into denying merchandise to a competing dealer. Of course, the suit in *Sharp* was against the manufacturer, and perhaps this is the explanation as to why the policy discussion is couched as it is. In the present case, the problem is more acutely presented, because the suit is against the complaining dealer. One must candidly recognize that the policy justifications given by the majority in *Sharp* have no discernible bearing upon the conduct of Macy in the present case. Having said this, the court is still of the view, for the reasons set forth above, that the holding in *Sharp* is controlling in the present case, and requires dismissal of plaintiff's Sherman Act claims.

It will be recalled that there was some communication between the two manufacturers, Backflips and Little Dippers. However, the initiative was that of Macy, who brought pressure to bear individually upon Backflips and upon Little Dippers. Although Backflips and Little Dippers exchanged information about what they were doing in response to Macy, there is no basis for any finding that Backflips and Little Dipper had any agreement or commitment between themselves—*i.e.*, entered into any horizontal agreement or conspiracy.

The holding in *Sharp* thus forecloses the price-fixing claim in Count I of the amended complaint and the boycott claim in Count II. *Sharp* also precludes the third theory of plaintiff, that Macy has *per se* liability for a nonprice vertical restraint because of the alleged inevitable effect on competition.

CONCLUSION

Summary judgment must be granted dismissing the Sherman Act claims. Without these claims, there is no basis for retaining jurisdiction over the state claims.

The action is dismissed.

SO ORDERED.