STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-00-548
REC- CuM-7/26/2001

STATE OF MAINE,

Plaintiff

- v.

MAINEHEALTH and
MAINE MEDICAL CENTER,

Defendants

ORDER ON PLAINTIFF'S
MOTION FOR
SUMMARY JUDGMENT

## FACTUAL BACKGROUND

Defendant Maine Medical Center ("MMC"), a non-profit and charitable corporation, is a community hospital[1] and tertiary center for southern and central Maine. PSMF ¶ 2; Defendant's Statement of Material Facts ("DSMF") ¶ 11. Defendant MaineHealth, formerly known as Maine Medical Center Foundation, is a tax-exempt and charitable corporation. DSMF ¶ 9. MaineHealth is the sole member of its corporate affiliates, which include MMC, Miles Health Care Center in Damariscotta, St. Andrew's Hospital in Boothbay Harbor, and Community Health Services in Bridgton, Portland and Windham. PSMF ¶¶ 3, 4.

In 1997, MMC and MaineHealth published advertising in *The Bridgton News*, a weekly newspaper with a circulation area including Bridgton, Brownfield, Casco, Denmark, Fryeburg, Harrison, Lovell, Naples and Sebago. Id. ¶¶ 6, 9. On July 25,

---

[1] The parties have identified three levels of hospital services. Primary care, the first level, is received on an ambulatory basis or a very simple hospitalization basis. Hospitals providing secondary care have an "increasingly complex ability to deal with disease and mental problems." Tertiary care represents the highest level and deals with the very complex procedures such as cardiovascular surgery, high-level oncology and bone marrow transplants. PSMF ¶ 2 & McDowell Dep. at 15. Community hospitals meet the primary care and secondary care service needs of a specific geographic area but do not offer tertiary care. PSMF ¶ 2 & McDowell Dep. at 16.

1997, John Weisendanger, the chief executive officer ("CEO") of Bridgton Hospital,[2] wrote to Donald McDowell, CEO of MaineHealth, to inform him that he considered MaineHealth's advertising to be a "direct affront" to his hospital's relationship with MMC. Id. ¶ 12. Mr. Weisendanger requested to be informed as to MaineHealth's plans to continue similar advertising. Id. McDowell responded by letter dated July 31, 1997 that he had no idea that the MaineHealth introduction advertisements would be considered "competitive" and that MaineHealth would no longer run the advertisements. Id. ¶ 13.

Creative Design & Marketing ("CD&M"), a company providing advertising-related services to MMC and MaineHealth, was instructed to cancel MaineHealth's advertising in *The Bridgton News* in August, 1997. Id. ¶ 14. A CD&M memorandum was then faxed to *The Bridgton News* conveying this cancellation. Id. Prior to these events, MaineHealth had reserved four insertion dates for the fall of 1997 and six dates for the spring and summer of 1998 for its advertisements in *The Bridgton News*. Id. ¶ 10. Neither MMC nor MaineHealth placed any advertisements other than "help wanted" advertisements in that newspaper between August 11, 1997 and June, 2000. Id. ¶ 15. Both entities did continue to run advertising in other media, however. Id. ¶¶ 14, 15. MMC continued to advertise in the *Portland Press Herald* and *Maine Sunday Telegram*, both of which are sold to residents in Bridgton and surrounding towns. DSMF ¶¶ 4, 5.

---

2 Bridgton Hospital, formerly known as North Cumberland Memorial Hospital, is a general and acute care community hospital. PSMF ¶ 1.

On May 5, 2000, the State of Maine filed a complaint alleging that an agreement had been entered into by and between MaineHealth, MMC and Bridgton Hospital which constituted a per se illegal market allocation in violation of the Maine Unfair Trade Practices Act, 5 M.R.S.A. §§ 205-A-213, and the Maine mini-Sherman Act, 10 M.R.S.A. § 1101. Alternatively, the complaint alleges that there was an agreement which violated the law under a rule of reason analysis. On May 5, 2000, the State and Bridgton Hospital submitted a Consent Decree resolving the charges against that defendant. The State, MaineHealth and MMC then filed a Stipulation of Partial Dismissal as to the alleged violation under the rule of reason on May 14, 2001.

The State now seeks summary judgment on its complaint against MaineHealth.[3] Because the Court finds an issue of fact exists as to whether MaineHealth and Bridgton Hospital were actual or potential competitors, the State's motion is denied.[4]

## DISCUSSION

Pursuant to section 1101 of the Maine mini-Sherman Act, 10 M.R.S.A. §§ 1101-1109 (1997), "[e]very contract, combination in the form of trusts or otherwise, or

---

[3] No summary judgment as against MMC has been sought.

[4] Because an issue of fact exists as to whether Bridgton Hospital and MaineHealth were competitors, it is not necessary to decide whether an agreement between the two entities was formed. Therefore, the Court need not determine whether the facts allegedly showing MaineHealth's unilateral decision to terminate advertising were properly before the Court. See M.R. Civ. P. 56(h)(4). At trial it will be the Plaintiff's burden to establish the existence of the agreement that it has alleged between MaineHealth and Bridgton Hospital.

conspiracy, in restraint of trade or commerce in this State" is illegal. The similar provision of the Sherman Act[5] has been interpreted to prohibit only unreasonable restraints of trade. Bus. Elec. Corp. v. Sharp Elec. Corp., 485 U.S. 717, 723 (1988). Courts therefore ordinarily apply the "rule of reason"[6] to determine whether the particular business combination or contract is a restraint on trade. Id. Certain categories of agreements are presumed to be per se unreasonable, however, due to their "pernicious effect on competition and lack of any redeeming virtue." N. Pac. Ry. Co. v. United States, 356 U.S. 1, 5 (1958). Once an agreement is determined to be per se unreasonable, an antitrust plaintiff need not provide proof of intent or anticompetitive effect. See Nynex Corp. v. Discon, Inc., 525 U.S. 128, 133 (1998); L. Ray Packing Co. v. Commercial Union Ins. Co., 469 A.2d 832, 834 (Me. 1983).

One category of per se violations are those agreements between actual or potential competitors to divide the market in order to reduce competition. See Palmer v. BRG of Georgia, Inc., 498 U.S. 46, 49-50 (1990) (market allocation agreements are anticompetitive "regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other"). Such an agreement is termed a "horizontal restraint,"

_____

[5] The Sherman Act declares illegal "[e]very contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations. . . ." 15 U.S.C.A. § 1 (1997).

[6] Rule of reason analysis, unlike per se analysis, requires a case-by-case determination that the particular restraint is anticompetitive. Bus. Elec. Corp. v. Sharp Elec. Corp, 485 U.S. 717, 723 (1988). This analysis requires the factfinder to weigh all the circumstances of a particular case to determine whether the restrictive practice should be prohibited because it imposes an unreasonable restraint on competition. Cont'l T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49 (1977).

in contradistinction to a "vertical restraint" which requires an agreement between parties at different levels of distribution such as a manufacturer and its distributor. United States v. Topco Assoc., Inc., 405 U.S. 596, 608 (1972).

The Supreme Court has declared horizontal territory limitations to be "naked restraints of trade with no purpose except stifling of competition." Id. (citation omitted). The horizontal agreement need not foreclose all possible avenues of competition to be designated per se illegal. See, e.g., id. at 600 (agreement between stores to sell only Topco-controlled brands within certain territories held per se illegal even though the stores competed with regard to other products); Blackburn v. Sweeney, 53 F.3d 825, 827-29 (7th Cir. 1995) (mutual agreement between two law firms to restrict advertising to designated geographic areas in Indiana held per se illegal even though the firms were still able to practice law in all parts of the state).

The State contends that Bridgton Hospital and MaineHealth agreed to allocate Bridgton Hospital's prospective customers who read *The Bridgton News*. The alleged agreement is only illegal, however, if Bridgton Hospital and MaineHealth were actual or potential competitors in 1997. See Transource Int'l, Inc. v. Trinity Indus., Inc., 725 F.2d 274, 280 (5th Cir. 1984) (affirming district court's determination that agreement did not constitute a per se violation because the two parties were not actual or potential competitors). Actual competitors do business in the same product and geographic markets. See Palmer, 498 U.S. at 49. Even if Bridgton Hospital and MaineHealth were not actual competitors, the State may prove that MaineHealth was a potential competitor by showing a "desire, intent, and

5

capability" to enter the market. <u>Engine Specialties, Inc. v. Bombardier Ltd.</u>, 605 F.2d 1, 9 (1st Cir. 1979).

## A. MaineHealth as an Actual or Potential Competitor

The State contends that MaineHealth was an actual or potential competitor in the delivery of hospital services market because it was or aspired to be an integrated delivery system ("IDS") in 1997. An issue of fact exists as to whether an IDS provides hospital services or merely packages and promotes hospital services.[7] <u>Compare</u> PSMF ¶ 8 & Clark Dep. Ex. WC4 at 4 (IDS is an umbrella under which MMC and all other components of the system exist), <u>and</u> Defendant's Responsive Statement of Material Facts ("DRSMF") ¶ 8(2) & Clark Aff. Ex. A (members of the MaineHealth system provide care while MaineHealth provides information to healthcare consumers), <u>with</u> PSMF ¶ 9(b) & Ex. A ("MaineHealth has the facilities, the professionals, and the technology to meet your healthcare needs."), <u>and</u> DRSMF ¶ 3(1) & McDowell Aff. ¶ 13 (IDS provides the full continuum of health care services, including hospital services). An issue of fact also exists as to whether MaineHealth was an IDS in 1997. <u>Compare</u> DRSMF ¶ 3(2) (MaineHealth was not an IDS at the time of the alleged agreement), <u>with</u> PSMF ¶ 9(b) & (f) (MaineHealth's advertisements in 1997 asserting it was an IDS).

## B. Imputing MMC's Status as an Actual Competitor to MaineHealth

The State seeks to impute MMC's alleged status as Bridgton Hospital's

---

[7] Whether, in the context of this case, an IDS provides hospital services or merely packages and promotes the services of its component parts is of great significance. Because a promoter of hospital services is likely at a different distribution level than a provider of hospital services, an agreement between the two may not necessarily be horizontal in nature.

competitor to MaineHealth. An issue of fact exists as to whether MaineHealth and MMC were functionally one entity. The two corporations had separate management at the time of the alleged anticompetitive agreement. DRSMF ¶ 3(1). McDowell, in his capacity as President of MaineHealth, made the determination that MaineHealth should cease advertising in *The Bridgton News*. Id. ¶ 7(2). MaineHealth's March 27, 1997 advertisement in *The Bridgton News* suggests that it did control MMC at the time of the alleged anticompetitive agreement, however. That advertisement states: "Who are we? *We're Maine Medical Center*, offering complete inpatient services at our main campus, and offering outpatient services at our Brighton and Scarborough campuses." PSMF ¶ 9(b) & Ex. A (emphasis added).

MaineHealth's status as the sole member of its corporate affiliates, including MMC, also raises an issue of fact regarding the relationship between MaineHealth and MMC. Pursuant to the Maine Nonprofit Corporations Act, 13-B M.R.S.A. §§ 402-805 (1981 & Supp. 2000), a nonprofit corporation "may have one or more classes of members or may have no members." Id. § 402. The articles of incorporation designate the class or classes of members and identify a member's rights and qualifications, including a member's voting privileges. Id. §§ 402, 604. A nonprofit corporation's bylaws provide for the regulation and management of the corporation. Id. § 601. Neither party has provided the Court with MMC's articles of incorporation or bylaws. The Court is therefore unable to determine whether, pursuant to those documents, MaineHealth manages MMC's corporate affairs. There also is no evidence before the Court that the two corporations have common directors or

7

officers.

The entry is

Plaintiff's Motion for Summary Judgment is DENIED.

Dated at Portland, Maine this 26th day of July, 2001.

Robert E. Crowley
Justice, Superior Court

Pp Atty -
Francis Ackerman -
AAL
Do Atty
Robert Frant, Esq.

8